ST. CLAIRE, Frank "X", Appellant
in No. 80–1077

v.

CUYLER, Julius, Individually; Walker, Individually; D. C. Wampole, Individually; Martin Dragovich, Individually; R. H. Spaid, Individually; James Thrash (Turner), Individually; John Burroughs, Individually.

ST. CLAIRE, Frank "X"

v.

CUYLER, Julius, Individually; Walker, Individually; D. C. Wampole, Individually; Martin Dragovich, Individually; R. H. Spaid, Individually; James Thrash (Turner), Individually; John Burroughs, Individually,

Julius Cuyler, William Walker, Dennis Wampole, Martin Dragovich, Robert Spaid, James Thrash and John Burroughs, Appellants in No. 80–1078.

No. 80–1077/8.

United States Court of Appeals,
Third Circuit.

Argued Sept. 16, 1980.

Decided Nov. 6, 1980.

Edmond A. Tiryak (argued), Community Legal Services, Inc., Law Center Northeast, Philadelphia, Pa., for appellant; Nicholas Orlyk, on the brief.

Mark N. Cohen (argued), John O. J. Shellenberger, Edward G. Biester, Jr., Atty. Gen., Philadelphia, Pa., for appellees.

Before ALDISERT, ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The question for decision in this appeal by the Commonwealth of Pennsylvania defendants from the district court judgment after a non–jury trial is whether the court erred in determining that certain practices at the State Correctional Institution at Graterford, Pennsylvania, violated an inmate's first amendment rights under the free exer-

cise clause. We conclude that there was error and reverse.

### I.

This litigation arises out of three discrete incidents at the Graterford prison. In the first incident, prison officials punished Frank "X" St. Claire, an inmate, for failing to obey an order not to enter the prison dining room wearing a kufi, a religious head covering. In another, they refused to permit him to pass through the main corridor security gate wearing a turban made from a bed sheet. In the third incident, they refused to provide a guard to escort him from a segregated housing unit to religious services attended by inmates in the prison's general population. St. Claire brought a civil action under the Civil Rights Act of 1871, 42 U.S.C. § 1983, asking for declaratory, injunctive, and damage relief for alleged infringements of his first and fourteenth amendment rights of free exercise of religion. Subject matter jurisdiction was based on 28 U.S.C. §§ 1343, 2201, and 2202. The district court found constitutional violations in each of the three incidents and granted declaratory and injunctive relief, but it denied the claim for compensatory damages.[1] *St. Claire v. Cuyler*, 481 F.Supp. 732 (E.D.Pa.1979).

### II.

Our recitation of the relevant historical facts generally follows that of the district court. In 1968 St. Claire joined the religious group known as the Nation of Islam, and in 1973 he changed his affiliation to the Ahmadiyya branch of Islam. He is presently a practicing Muslim and believes in the "five pillars of Islam": that there is no God but Allah and Mohammed is his messenger; that he should observe prayer at least five times a day; that he should pay *zakat* (alms

[1]. St. Claire appeals from the denial of damages; the Commonwealth defendants are cross–appellants. Because we find no liability, we will affirm the district court's judgment in the appeal by St. Claire at No. 80–1077. Because this opinion treats the appeal by the Commonwealth defendants at No. 80–1078, we refer to them as appellants.

The appellants are Julius Cuyler, superintendent of the State Correctional Institution at Graterford; William I. Walker, D. C. Wampole, John Burroughs, and R. H. Spaid, correctional officers at Graterford; Martin Dragovich, a corrections counselor and acting case work supervisor during the relevant period, and James Thrash, maintenance superintendent.

to charity); that he should fast during the holy month of Ramadan; and that he should make a pilgrimage to Mecca at least once during his life if financially and physically able.

He also believes that he should, whenever and wherever possible, and especially while praying, wear a kufi, which is a small round hat and which to St. Claire indicates piety, humility, neatness, and devotion. Wearing the kufi is not mandatory, but it is traditional, and he believes it brings him closer to his God. It is also an insignia of the Ahmadiyya movement. In addition, his religion mandates attendance as often as possible but at least once a month at the Friday congregational prayer service known as Jumuah. St. Claire and other Muslims believe that congregational prayer provides twenty times more blessings than individual prayer.

St. Claire alleges that on three specific occasions, occurring in December, 1976, and in July and September, 1977, his free exercise rights were infringed. From December, 1976, through September, 1977, appellee resided at times in a general population unit, in a segregated unit called B gallery, and in the Behavioral Adjustment Unit (BAU), now known as the Restricted Housing Unit (RHU). Although both B gallery and RHU are segregated units, inmates on B gallery have more privileges than those in RHU. They are allowed out of their cells for breakfast, lunch, dinner, yard recreation, and showers, while inmates in RHU are allowed out of their cells only once a day.

On December 10, 1976, appellee entered the B gallery dining room at mealtime wearing his kufi, in violation of a prison rule prohibiting hats in the dining areas. Officer Walker ordered appellee to remove the kufi, and St. Claire protested that it had religious significance for him and that he wished to continue to wear it. The events that followed are disputed. Appellee testified that although he was distressed and angered, since he believed his religious rights to have been infringed, he removed the kufi and replaced it as he was leaving the area. Officer Burroughs testified that St. Claire went through the "chow line," got his food, and returned to his seat, all without removing his hat, and that after he was seated St. Claire again disobeyed an order to remove his hat. Both parties agree that Burroughs told St. Claire that he was guilty of a "misconduct" for wearing the kufi and refusing to obey an order. As a result of the misconduct, appellee was immediately returned to the BAU to serve the remainder of a term there for a previous infraction that was to have expired December 17, and for which he had been released early. Following a December 13 hearing on the misconduct, appellee was ordered confined in the BAU until December 17 and given ninety days probation, expiring on March 13, 1977.

The second incident occurred on September 14, 1977, when appellee had an appointment to meet with the Parole Board. Attending the Parole Board hearing required St. Claire to proceed beyond the security gate in the main corridor, where, according to Superintendent Cuyler, prisoners are not allowed to wear "civilian clothes." [2] In proceeding to the meeting, St. Claire wore a turban made from a bedsheet wrapped around his head. A turban is another form of religious head covering similar in purpose to the kufi, and for St. Claire and other Muslims it has religious significance. Officer Wampole refused to permit appellee to proceed beyond the security gate to the treatment area in order to attend the Parole Board hearing unless he removed his turban. For religious reasons St. Claire refused, and he did not meet with the Board.

The third incident occurred on July 20, 1977, when appellee was confined to B gallery. On that date appellee made a formal written request for permission to attend Jumuah services. Superintendent Cuyler denied the request and advised St. Claire that he would be allowed to attend religious

---

**2.** Cuyler explained that "[c]ivilian clothes would encompass all clothing that are not the prison garbs or prison clothing." App. at 1–79a.

services only after his release from segregation. As a matter of policy, allegedly never varied, inmates confined to B gallery or RHU are not permitted to attend religious services. There is no evidence on the record to show that Muslim prisoners are treated any differently from members of other religious faiths.

### III.

We begin our analysis by noting the truism that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979) (collecting cases). However, as we have previously recognized, prisoners' constitutional rights are subject to restrictions and limitations that would be intolerable outside prison walls. *See Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 759–60 (3d Cir. 1979). "The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights." *Wolfish*, 441 U.S. at 546, 99 S.Ct. at 1878. "There must be a 'mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application'." *Id.* (quoting *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974)). This case requires us to apply the "mutual accommodation" that has been established by recent Supreme Court decisions.

This court last considered a challenge to prison regulations on free exercise grounds in *O'Malley v. Brierley*, 477 F.2d 785 (3d Cir. 1973). In *O'Malley*, speaking through the present writer, we reviewed our prior decisions [3] and concluded that "where a state does afford prison inmates the opportunity of practicing a religion, it may not, without reasonable justification, curtail the practice of religion by one sect." [4] *Id.* at 795. Central to the determination of this case are circumstances not present in *O'Malley*: there we reviewed only the grant of summary judgment on the slimmest of records; in contrast to this case, in *O'Malley* we had no trial record presenting a detailed factual predicate for analyzing the tension between the first amendment and internal security. The Supreme Court has now specifically addressed these concerns in a number of decisions. In *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the Court held that "challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system...." *Id.* at 822, 94 S.Ct. at 2804.[5] It identified four important functions of the corrections system, three of which relate to society's basic justification for establishing prisons: deterrence of crime, protecting the public by "quarantining" offenders, and rehabilitation. *Id.* at 822–23, 94 S.Ct. at 2804. "Finally," it noted, "central to all other

---

**3.** The decisions we surveyed in *O'Malley* include *Wilson v. Prasse*, 463 F.2d 109 (3d Cir. 1972); *United States ex rel. Jones v. Rundle*, 453 F.2d 147 (3d Cir. 1971); *Gittlemacker v. Prasse*, 428 F.2d 1 (3d Cir. 1970); and *Long v. Parker*, 390 F.2d 816 (3d Cir. 1968). *See O'Malley*, 477 F.2d at 795.

**4.** In remanding the proceedings for a new trial in *O'Malley* we stated:
> Because we are remanding for a trial, we emphasize that the state may not interpose an unreasonable barrier to the free exercise of an inmate's religion. The test for the fact finder, therefore, is simply whether under all of the circumstances, the state has sustained its burden of proof that it was reasonable for the prison authorities to [impose the particular restraint on the free exercise of religion]. In arriving at its "reasonableness" determi-

nation, the fact finder shall find the regulation to be reasonable only if the alternative chosen ... resulted in the least possible "regulation" of the constitutional right consistent with the maintenance of prison discipline.

*Id.* at 796.

**5.** The plaintiffs in *Pell* challenged a state corrections department regulation prohibiting personal interviews between press representatives and individual inmates whom they specifically named and asked to interview. The prisoners asserted that the regulation violated their first and fourteenth amendment rights of free speech, while the media plaintiffs argued that the regulation was an unconstitutional restriction on the freedom of the press.

corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Id.* at 823, 94 S.Ct. at 2804. The Court also indicated that considerations of rehabilitation and institutional security "are peculiarly within the province and professional expertise of corrections officials," and held that "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 827, 94 S.Ct. at 2806. It then concluded that in the light of alternative means of communication available to the inmates, the challenged regulation was not unconstitutional. *Id.* at 827–28, 94 S.Ct. at 2806–2807.

*Pell* was followed by *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 69 (1977), another case involving the tension between institutional security and first amendment freedoms of expression and association.[6] The Court again deferred to the expertise of state corrections officials. It recited the testimony of state officers, that permitting a prisoners' labor union to function would result in "friction" and might lead to "[w]ork stoppages ... mutinies .... [r]iots and chaos," *id.* at 127, 97 S.Ct. at 2538, and concluded, "[t]he District Court did not reject these beliefs as fanciful or erroneous. It, instead, noted that they were held 'sincerely,' and were arguably correct.... Without a showing that these beliefs were unreasonable, it was error for the District Court to conclude that appellants needed to show more." *Id.* at 127–28, 97 S.Ct. at 2538–2539 (citation and footnote omitted). The Court re–emphasized the same holding later in the opinion:

**6.** In *Jones* the state department of corrections prohibited inmates from soliciting other inmates to join the Prisoners' Labor Union, barred all meetings of the union, and refused to deliver bulk mailings of union publications to inmates. The union brought suit alleging that the prohibition unlawfully infringed on its and its members' first amendment rights of freedom of speech and association.

Appellant prison officials concluded that the presence, perhaps even the objectives, of a prisoners' labor union would be detrimental to order and security in the prisons .... It is enough to say that they have not been conclusively shown to be wrong in this view. The interest in preserving order and authority in the prisons is self–evident. Prison life, and relations between the inmates themselves and between the inmates and prison officials or staff, contain the ever–present potential for violent confrontation and conflagration. *Wolff v. McDonnell*, 418 U.S. [539, 561–62, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935 (1974).] Responsible prison officials must be permitted to take reasonable steps to forestall such a threat, and they must be permitted to act before the time when they can compile a dossier on the eve of a riot.[9]

[9] The informed discretion of prison officials that there is potential danger may be sufficient for limiting rights even though this showing might be "unimpressive if ... submitted as justification for governmental restriction of personal communication among members of the general public." *Pell v. Procunier*, 417 U.S. 817, 825, 94 S.Ct. 2800, 2805, 41 L.Ed.2d 495 (1974).

*Id.* at 132–33 n.9, 97 S.Ct. at 2541 n.9.

*Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), although not primarily a first amendment case,[7] provides additional guidance for deciding the present case. The Court in *Wolfish* reiterated that prisoners do not lose all constitutional protections by reason of conviction and confinement, *id.* at 545, 99 S.Ct. at 1877; but that prisoners' rights are subject to restrictions and limitations, *id.* at 545–46, 99 S.Ct. at 1877–78; and that "even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated

**7.** The inmate respondents in *Wolfish* relied on the due process clause of the fifth amendment to challenge various practices and regulations governing their pre–trial detention at a federally operated corrections center. They also relied on the first amendment in challenging a rule that permitted inmates to receive books and magazines from outside the institution only if they were mailed directly from a publisher or a book club.

in the light of the central objective of prison administration, safeguarding institutional security." *Id.* at 547, 99 S.Ct. at 1878 (citing *Jones, Pell,* and *Procunier v. Martinez,* 416 U.S. 396, 412–14, 94 S.Ct. 1800, 1810–11, 40 L.Ed.2d 224 (1974)). It then concluded:

> [T]he problems that arise in the day–to–day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide–ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.... But judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial.

*Id.* at 547–48, 99 S.Ct. at 1878–79 (citations omitted).

These Supreme Court pronouncements must be considered in evaluating the concept of "reasonable justification" utilized by the district court at the trial of this case. The district court relied on the following statement in *O'Malley*: "[T]he fact finder shall find the regulation to be reasonable only if the alternative chosen ... resulted in the least possible 'regulation' of the constitutional right consistent with the maintenance of prison discipline." 477 F.2d at 796. One isolated statement from *O'Malley*, however, cannot be taken out of context; it must be considered in conjunction with the body of law announced by this court that preceded it, *see* note 3 *supra*, and the teachings of the Supreme Court that have succeeded it, specifically addressing the tension between first amendment rights and internal security concerns. We are persuaded that these Supreme Court decisions indicate that the district court's interpretation of "reasonableness" imposed too rigid a burden on prison authorities. Such a strict standard does violence to the wide–ranging deference that must be accorded prison officials and the determination that first amendment values must give way to the reasonable considerations of prison management. First amendment freedoms may be curtailed whenever the officials, in the exercise of their informed discretion, reasonably conclude that the first amendment exercise possesses "the likelihood of disruption to prison order or stability, or otherwise interfere[s] with the legitimate penological objectives of the prison environment." *Jones,* 433 U.S. at 132, 97 S.Ct. at 2541. The deferential review required by the Supreme Court's decisions leaves no room for a requirement that prison officials choose the least restrictive regulation consistent with prison discipline. *See also Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 759 (3d Cir. 1979).

In *Jones,* the Supreme Court held specifically that the burden is not on prison officials to show affirmatively that restricted activities would be detrimental to proper penological objectives or would constitute a present danger to security and order. 433 U.S. at 128, 97 S.Ct. at 2539. We therefore conclude that the state needs only to produce evidence that to permit the exercise of first amendment rights would create a potential danger to institutional security.[8] This evidence may consist of expert testimony from the responsible officials, provided they testify to opinions that are "held 'sincerely' and [are] arguably correct." *Id.* at 127, 97 S.Ct. at 2538. In determining whether the state has met its burden of production, the court must be mindful of the Supreme Court's instruction that restrictions on first amendment rights may be

---

**8.** Internal security is "central to all other corrections goals." *Pell,* 417 U.S. at 823, 94 S.Ct. at 2804; *see also Wolfish,* 441 U.S. at 546–47, 99 S.Ct. at 1877–78. Therefore, our conclusion does not apply a fortiori to cases in which the state attempts to justify a first amendment restriction by referring to some other legitimate goal of the penal system. Because these appellants rely on security concerns to justify the challenged policies, we need not now consider what standard would apply in those cases.

deemed valid when prison officials, in the exercise of their informed discretion, conclude that there is a potential danger to security, even though the same showing might be unimpressive if submitted to justify restrictions upon members of the general public. *Id.* at 133 n.9, 97 S.Ct. at 2541. Once the state has met its burden of going forward with the evidence, the courts must defer to the expert judgment of the prison officials unless the prisoner proves by "substantial evidence . . . that the officials have exaggerated their response" to security considerations, *Pell,* 417 U.S. at 827, 94 S.Ct. at 2806, or that their beliefs are unreasonable, *Jones,* 433 U.S. at 128, 97 S.Ct. at 2539.

## IV.

We now turn to the record to determine whether the Commonwealth appellants met their burden of production, and if so whether St. Claire carried his burden of proving the appellants' concerns unreasonable or their response exaggerated. Superintendent Cuyler, called by St. Claire as on cross-examination, testified that Graterford's policy against headgear in dining areas is "a matter of decorum, and it's a matter of security, and some other things." App. at 1–57a. When asked by the court to elaborate, he explained that there are "several reasons" for the policy: first, hats could be used to conceal contraband, such as small weapons, small tools such as a hacksaw or other cutting device, or drugs. In addition, Cuyler testified that "our experience has been over the years that certain inmates would wear certain types of head covering for identification. This within itself could trigger off some kind of problem in an area where you are feeding [300 to] 400 men together." When asked by the trial judge whether these concerns would not apply elsewhere in the prison, Cuyler replied:

> That is correct, but the reality of the situation is that the dining rooms in a prison are hot spots and at Graterford Prison we [have] five dining rooms . . . and we only have approximately 40 officers inside the main prison controlling approximately 1800 inmates, and during the feeding period only, there [are] only a

certain amount of those officers assigned to control the dining room areas.

App. at 1–58a.

Deputy Superintendent Mauger also testified that headgear in dining areas could interfere with decorum, conceal contraband, and serve as a means of group identification. App. at 2–162a. He considered group identification a security problem because discrete groups of inmates are likely to demonstrate hostility toward other inmates who are not members of the group, for example, by cutting in line and taking over seating areas. App. at 2–162a to 2–163a. He testified that approximately 370 inmates are in a dining hall at a time, and that no more than five guards are available to supervise each dining area. App. at 2–163a. Forty–five minutes are allotted for each meal, and in Mauger's view it would be impossible to search each inmate for contraband both entering and leaving the dining area, at least if numerous inmates wore headgear. App. at 2–164a.

Superintendent Cuyler also testified that a prison rule prohibits inmates from wearing civilian clothes past the security gate that leads to the administration building. App. at 1–76a. Officer Wampole acted pursuant to this rule on September 14, 1977, when he refused to permit St. Claire to pass through the security gate to attend a Parole Board hearing wearing a turban. Cuyler explained that the security gate separates the cell blocks from the administrative offices, treatment area, hospital area, and the front control gates. He stated that civilian personnel are employed in the areas outside the security gate where the parole hearings are held, and that these civilians are not readily identifiable by any dress code. He expressed the view that it was necessary, from a security standpoint, to make certain that inmates who entered that particular area could be readily identified and not confused with staff members. App. at 1–79a, 1–80a. The Deputy Superintendent amplified the identification problem and emphasized that civilian employees, who are not as security conscious as the prison guards, could mistake a prisoner wearing

civilian clothes for a civilian and open a door providing access to the outside. App. at 2–166a to 2–167a.

With regard to St. Claire's third complaint, Superintendent Cuyler testified that it would be necessary to provide two officers to escort a prisoner from the B gallery to religious services, and that escorting inmates to religious services would not be feasible because of the shortage of officers. He stated that there are only 40 officers working inside the walls, while there are 50 cells in B gallery and 27 in the Restricted Housing Unit (RHU). App. at 1–67a, 1–68a. Inmates confined in B gallery and the RHU are generally there for committing serious infractions of prison rules or for the purpose of keeping certain individuals separated from each other. App. at 1–75a. Cuyler testified that assigning a guard to escort duty lessens the security in the area where his normal post is located, and therefore that it is not feasible to pull officers from their normal security assignments to provide special escort service. App. at 1–76a.

◼ We hold as a matter of law that this evidence satisfied appellants' burden of production. Graterford officials testified at some length that the three challenged regulations were justified by considerations of security, and they explained the reasons for those regulations. There is no suggestion that the officials' beliefs are not sincerely held; and giving proper deference to the expert judgment of prison authorities, we

cannot say that their views are not "arguably correct." *See Jones*, 433 U.S. at 127, 97 S.Ct. at 2538. Whether there were other reasons for the regulations is simply immaterial.[9]

Once appellants satisfied their burden of going forward with the evidence, the burden shifted to St. Claire to prove by substantial evidence that the security concerns were unreasonable or the responses exaggerated. We have examined the entire record, and it is clear that he has not carried that burden. Indeed, he made no effort to prove the policies unreasonable or exaggerated. Whatever the reason, "[i]t is enough to say that [the prison officials] have not been conclusively shown to be wrong." *Jones*, 433 U.S. at 132, 97 S.Ct. at 2541. Therefore, the district court erred in holding that the appellants had violated St. Claire's constitutional rights.

◼◼ We note finally that with regard to the problem of escorting inmates to religious services, the district court was able to devise a system which, in its view, was less restrictive of inmates' rights. In view of these recent Supreme Court decisions, the district court erred in basing its finding of a constitutional deprivation on the authorities' failure to select the least restrictive alternative. Giving "wide–ranging deference" to decisions of prison officials, the test on review is whether there is a reasonable relation to security requirements in their exercise of informed discretion. *Wolfish* announced the Supreme Court's

---

9. The district court found that the prohibition of headgear in dining areas was based primarily on concerns of decorum and good manners and had no substantial basis in any security needs. *St. Claire v. Cuyler*, 481 F.Supp. 732, 739 (E.D.Pa.1979). For the reasons set forth in the text, we deem this finding clearly erroneous. It seems clear that the trial judge made this finding only because he tested the evidence by an erroneous legal standard. The Supreme Court has mandated that the courts defer to the expert judgment of corrections officials and place the burden on prisoners to prove by substantial evidence that the officials' security concerns are unreasonable or their responses exaggerated. The court below, however, held that "[t]he burden is on the prison authorities to show a substantial and important interest"

justifying the rule, and that they had not carried that burden. *Id.* at 738.

We see no reason, however, to delay decision of this case by remanding to the district court. On this record, the ultimate outcome is a foregone conclusion. Our decision is based on the uncontroverted findings of historical facts entered by the court and on the undisputed testimony of the prison officials. When there is no factual dispute, an appellate court is as capable of applying the proper legal standards as is the court below. *See, e. g., Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 69 (1977); *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964).

definition of reasonableness in the prison context: a restriction is not reasonably related to a legitimate goal if it is "arbitrary or purposeless." 441 U.S. at 539, 99 S.Ct. at 1874. *Wolfish* also teaches that it is the informed discretion of the prison administrator that controls, as long as it is reasonably related to a legitimate correctional goal, and not "a court's idea of how best to operate a detention facility." *Id.*

## V.

Accordingly, for the above reasons, we will affirm the judgment of the district court at 80–1077, reverse the judgment at 80–1078, and remand these proceedings with a direction to enter judgment in favor of the defendants.