Ahmad Uthman SHABAZZ and
Sadr-Ud-Din Mateen, Plaintiffs,

v.

Edward O'LONE, Individually, and in his official capacity as Administrator of Leesburg Prison Complex; James A. Ucci, Individually, and in his official capacity as Chief Deputy Keeper of Leesburg Prison Complex; and William Fauver, Individually, and in his official capacity as Commissioner of the New Jersey Department of Corrections, Defendants.

Civ. A. No. 84–1789.

United States District Court,
D. New Jersey.

Oct. 15, 1984.

James Katz, Tomar, Parks, Seliger, Simonoff & Adourian, Haddonfield, N.J., for plaintiffs.

Irwin I. Kimmelman, Atty. Gen. of New Jersey by Laurie M. Hodian, Deputy Atty. Gen., Trenton, N.J., for defendants.

OPINION

GERRY, District Judge.

This case was brought under 42 U.S.C. § 1983. The plaintiffs, two inmates at the New Jersey State Prison at Leesburg, sought a preliminary injunction restraining the defendants, various correctional officials at Leesburg, from interfering with their attendance at the Jumu'ah, a Muslim congregational service occurring every Friday shortly after the noon hour. Pursuant to Rule 65(a)(2), the parties have agreed to consolidate the preliminary and permanent injunction applications. A hearing was held on June 20 and June 21, 1984. The following constitutes the court's Rule 52(a)

findings of fact and conclusions of law regarding the propriety of the issuance of the injunction.

FINDINGS OF FACT

1. Plaintiff Shabazz is a prisoner at Leesburg who has been a practicing Muslim since 1973. His security status within the institution is "gang minimum."[1] Plaintiff Mateen is also a prisoner at Leesburg, a practicing Muslim since 1977, and a "full minimum" inmate. There is no question as to the sincerity of the religious beliefs of either plaintiff. The defendants in this case are: William Fauver, New Jersey Commissioner of Corrections; Edward O'Lone, Leesburg Superintendent; and James Ucci, Chief Deputy at Leesburg.

2. Leesburg is a medium security state prison located on approximately 1100 acres of land. On this site, there is a main prison building which houses inmates assigned to maximum and gang minimum custody status. A second building, the Farm, houses only those inmates having full minimum status.[2]

In April 1983, the New Jersey Department of Corrections promulgated Standard 853, which sets out three prisoner custody levels, the privileges and responsibilities attached to each, and the criteria for assignment to each. Those prisoners considered the greatest security risk have "maximum" custody status. Such inmates "shall be assigned to activities within the confines of the security of the institution under continuous supervision." In the case of Leesburg, this means that such inmates must remain within the main building. There is an intermediate classification, "gang minimum." Inmates classified as gang minimum, according to Standard 853, "shall be assigned to activities or jobs which routinely require them to move outside the security of the institution, on institutional grounds, and within eyesight of a correction officer ... or other employee

authorized to supervise them." Successful completion of a period at gang minimum is a prerequisite to the attainment of "full minimum" status, the lowest security level. Inmates classified as full minimum, in the words of the Standard, "must be assigned to either (1) work details, jobs, or programs outside the main institution, on or off institutional grounds, with minimal supervision, or (2) a satellite unit or minimum security trailer unit (such as the Farm building), or (3) both (1) and (2)." Prior to April 1983, inmates had been eligible to proceed directly from maximum to full minimum status. Apparently, however, this somewhat radical reduction in supervision had been problematic, prompting the change reflected in the Standard. Also, apparently, prior to April 1983 certain inmates classified as gang minimum held jobs *within* the confines of their institutions (e.g., within the "main building"). The language of Standard 853, however, seems to mandate that gang minimum inmates routinely work *outside* the institutional buildings where they are housed, on institutional *grounds*. It seems that the new "outside" policy reflected in the standard was at least in part a response to a critical overcrowding in the state's prisons, and that the policy was at least in part designed to ease tension and drain on the facilities during that part of the day when the inmates were outside the confines of the main buildings.

According to the defendants, the new policy of increased outside assignments was not easily implemented. Although the number of inmates assigned to outside details gradually rose after April 1983, some inmates, for a variety of reasons, were able to avoid actually reporting for their assignments. Moreover, some inmates who went out on their work details, found reasons— legitimate or otherwise—for returning to the main building during the course of the work day. In the months following April 1983, the defendants instituted a few

---

1. A discussion of the several security levels to which an inmate may be assigned will be found *infra*.

2. There is a third unit, Ancora, which is geographically separate from the 1100 acre compound. Neither of the plaintiffs is housed at Ancora, and thus, no further discussion of this unit is warranted.

changes whereby those assigned to outside details would remain outside for the entire work day. For example, arrangements were made for lunch to be brought out to inmates rather than have them return to the institution for lunch; similarly, medications were brought out to the inmates, and appointments with doctors or social workers were scheduled for the late afternoon or early evening (following the end of the work day). These changes culminated in a memo dated March 7, 1984 and directed to the Leesburg inmate population. The memo reads as follows:

> Due to the increase of the size of outside details at both Medium [the main building] and Minimum [the Farm], once an inmate goes to work in the morning, he will remain on his detail throughout the day. He will no longer be brought back into the institution on a normal work day unless it is an emergency. In the event of an emergency, your detail officer will contact his immediate supervisor, who will see to it that you are brought in.

Thus this flat ban—except for emergencies—on returns to the facilities during the day has the effect of preventing practicing Muslims who work outside from participating in the Friday Jumu'ah service.

3. The Jumu'ah service is a congregational service with a minister, or imam, presiding. It is the only congregational service of the week, and it therefore is comparable to the Saturday service of the Jewish faith and the Sunday service of the various Christian sects. The service occurs on Fridays and must take place after the sun reaches its apex and before the next scheduled Muslim prayer, the Asr, a prayer performed individually in the mid-afternoon. Thus, Jumu'ah may only be said during a limited number of hours. In addition, unlike other Muslim prayers which are performed individually and can be made up if missed, the Jumu'ah is obligatory, cannot be made up, and must be performed in congregation. The Jumu'ah is therefore regarded as the central service of the Muslim religion, and the obligation to attend is commanded by the Qur'an, the central book of the Muslim religion.

4. Plaintiff Mateen testified that to his knowledge, Jumu'ah services, up until the March 1984 memo, had been conducted on a regular basis at Leesburg for at least the previous five years. Prior to March 1984, those Muslim prisoners classified as gang minimum who were housed at the main facility, assigned to outside work details, and who wished to attend the Jumu'ah were permitted to remain in the prison and work on an alternate detail within the main building on Fridays so that they could attend the service. Muslim prisoners housed on the Farm and assigned to outside work reported on Fridays to their regular work assignment but were permitted to return by themselves to the Farm to worship. Those inmates who remain inside the buildings may still attend Jumu'ah. In March 1984, the defendants changed the alternate work detail from a gang minimum detail to a maximum detail, thus eliminating the opportunity for gang minimum inmates assigned to outside details to remain inside on Fridays and attend the Jumu'ah.

At the time the complaint in this case was filed (and to this day), plaintiff Shabazz was a gang minimum inmate. Prior to March 1984, he had a job inside the main building and attended Jumu'ah. Since March 1984, Shabazz has worked outside and has been unable to attend the Jumu'ah. At the time the complaint was filed, plaintiff Mateen was also a gang minimum inmate. Prior to March 1984, he was assigned outside and worked the alternate detail on Fridays. After March 1984, he remained outside and was therefore unable to attend the Jumu'ah. However, on May 31, 1984, Mateen was reassigned to minimum status and transferred to the Farm. He was assigned to work in the kitchen, an inside job, so that presently he is able to attend the Jumu'ah. Although there was testimony from the defendants that job assignments are fairly constant, the court is not convinced that Mateen will not, at some time in the near future, be reassigned to an outside detail and consequently be deprived of the opportunity to participate in the Friday service. (Accordingly, we will reject

the defendants' mootness argument as to Mateen.)

5. At issue in this case are two regulations—Standard 853 and the March 7, 1984 memo—applicable to *all* Leesburg inmates, which, in combination, have the effect of denying plaintiffs the opportunity to attend the Jumu'ah.[3] In their testimony, defendants Ucci and O'Lone advanced several justifications for the two regulations. Standard 853 was explained as a response to prison overcrowding. The mandate that gang minimum prisoners work outside their institutions was described as a means to alleviate the tension produced by the presence of many men at close quarters, as well as a means to reduce the strain on institutional resources. Moreover, the mandatory transitional gang minimum level was seen as a means for reducing the "shock" caused by the sudden reduction in supervision.

The March 7, 1984 memo, it was stated, served a couple of purposes. The first objective had to do with "traffic control." The evidence establishes that, surrounding the main building at Leesburg, there is a gate through which all inmates entering the building must pass. At the time of entry, inmates must be strip-searched and otherwise processed. This same gate is the receiving area for all visitors to the institution, including the trucks making the frequent deliveries of supplies to the facility. It was felt by defendants that there was too much congestion at this gate, that too many guards were required to handle all the traffic, and that deliveries were unduly delayed.[4] Thus, the March 1984 directive effectively put an end to this congestion problem at the main building. However, this goal does not account for the prohibition on full minimum prisoners returning to the Farm during the day, since these prisoners do *not* have to pass through the gate to enter the Farm unit. A second goal was

advanced in support of the March 1984 policy. This goal was framed in terms of rehabilitation. It was stated that, in order for prisoners to be ready to undertake careers in the free society, they would have to learn to work a full, productive day without taking time off from their jobs to pursue personal matters. Thus, the new policy was designed to eliminate interruptions in the work day, interruptions which had been reduced by prior means (*see* No. 2, *supra*), but not totally eliminated. The policy took some pressure off guards supervising outside details, who, previously, had had to evaluate each reason possibly justifying a return to the facilities and either accept or reject that reason. Moreover, because gang minimum inmates must always be at least within eyesight of a guard, if permission were granted for any one inmate on a detail to return inside, *all* inmates on the detail would have to be marched inside. Thus, the rehabilitative lesson threatened to be lost on more than just the affected inmate.

Superintendent O'Lone further stressed that Leesburg's work program is not simply a "make-work" project. Goods produced at Leesburg and services provided by its inmates have positive, sometimes vital, effects throughout the state.

6. The March 7, 1984 memo addressed to the inmate population indicates that the new policy is a response to the "increase of the size of the outside details." The plaintiffs introduced documentary evidence which seems to indicate that in the months immediately preceding the issuance of the memo, the number of people on outside details either remained about the same or decreased slightly. In doing so, the plaintiffs sought to establish that the new policy, not grounded in the facts on which it purported to be based, was pretextual; that is, that its true purpose was not to deal with increased volume but to deprive

---

**3.** Although Mateen is presently able to attend the service, for the discussion that follows, we will assume that his tenure at his kitchen job is impermanent, and that he may at any time be moved outside.

**4.** During the time when all gang minimum prisoners were returned to the building at the end of their work day, but only at this time, a separate gate was set up to receive them.

inmates of the ópportunity for worship. However, the court does not believe the plaintiffs have proven their case on this issue. First, the memo does not give a time frame during which the size of details increased; certainly between April 1983 and March 1984, the size of the details increased. Second, the statistics introduced, according to the defendants, only refer to gang minimum details. Statistics were not kept for the number of full minimum inmates on outside details. The defendants credibly testified that the total number of men on outside details increased in the months preceding March, 1984. Moreover, the defendants testified that the statistics refer to the number of men *assigned* to outside details, not the number of men who actually reported for work. This latter number, it was stated, increased as the prison successively took steps to eliminate grounds for not reporting. Finally, the defendants testified that it was not their policy to always inform inmates of the reasons behind their actions. Thus, the memo was not drafted to reflect all the reasons—given above—for the institution of the new policy.

7. The plaintiffs also sought to establish that, notwithstanding the institution-wide nature of the March 1984 policy, individualized adjustments could be made to accommodate the religious practices of the plaintiffs with little inconvenience to the defendants, or disruption of the goals established by defendants. As to gang minimum inmates, such as the plaintiff Shabazz, it was proposed that they be permitted to return to the alternate detail on Fridays, as this adjustment would neither add to congestion at the main gate nor result in loss of work time. The defendants stated that the alternate detail had been converted to a detail for maximum inmates, and that the prison did not mix gang minimum and maximum inmates on details. Thus, the detail was no longer available for this purpose. The defendants did not explain why inmates of different security levels are not mixed on work as-

signments when otherwise they are mixed. However, the elimination of this alternate detail as a possible assignment for gang minimum inmates is in accordance with Standard 853's mandate to move gang minimum inmates outside. Therefore, the charge proposed by plaintiffs, although not a threat to the goals reflected in the March 7 policy, does interfere with the goals reflected in Standard 853.

As a second alternative, the plaintiffs proposed that, as to gang minimum inmates such as Shabazz, they be assigned to *other* gang minimum work details whose assignments require them to remain *inside* the main building. The defendants admitted that there are such details in the kitchen, bakery and tailor shop. They stated, however, that these details are reserved for the "riskiest" gang minimum candidates, those for whom it was felt an outside job might be problematic. Thus, it was felt that it would be ill advised to move these risky inmates outside to accommodate Muslims such as Shabazz. Moreover, such a course is arguably *contra* to Standard 853's mandate of moving outside those inmates capable of handling the additional responsibility.

As a third alternative, it was proposed that gang minimum inmates such as Shabazz be assigned to details that work Saturdays or Sundays, thereby permitting these inmates to make up any time lost by not working Fridays. The defendants admitted that there are a limited number of inmates assigned to Saturday or Sunday work. They stated, however, that this proposal was impracticable. Since prison personnel are needed for other programs on weekends, the creation of additional weekend details would be a drain on scarce human resources.

Regarding minimum security, Muslim inmates living at the Farm, such as plaintiff Mateen, it was proposed that they simply be assigned to jobs permitting them to work either in the Farm building or in its immediate vicinity.[5] This proposal would

---

5. Presently, inmates who work in the immediate vicinity of the Farm *are* permitted to attend the

interfere with neither Standard 853—which contemplates that full minimum inmates may be assigned to work *inside* satellite units such as the Farm—nor with the March 1984 policies, as the proposal would neither result in congestion nor a loss of worker productivity. The defendants justified their rejection of this proposal on a couple of grounds (which also have some applicability to the proposals advanced by plaintiffs regarding gang minimum detail assignments). First, it was stated that the defendants did not want to concentrate all Muslims who desired to attend the Jumu'ah in one or two details, and thereby create a cohesive, organized group capable of challenging the institution. The evidence indicates that there are a substantial number of Muslims at Leesburg so that, if all requested reassignment, they would possibly form all Muslim details. The institution, it was stated, has difficulty with affinity groups of this nature, which threaten prison discipline, order and security. Second, the defendants stated that any of the plaintiffs' suggestions would raise the problem of favoritism: non-Muslim inmates would resent the special considerations given Muslims; would themselves request individualized treatment—thus destroying the "bright line" rules enunciated in the two policies in question; and might themselves (abusively) seek to fit within the Muslim exception. As a practical matter, the defendants stated that there is insufficient staff at Leesburg to allow for too much individualized treatment of inmates.

## CONCLUSIONS OF LAW

1. The free exercise clause of the First Amendment generally prohibits government officials from interfering with the religious practices of *non-prisoners* absent a compelling justification, effectuated by a regulation interfering with the religious practice in the least restrictive manner possible.

■ This principle is not fully applicable to prisoners, however. Convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement. But those constitutional rights are limited by the legitimate goals and policies of the penal institution. *See St. Claire v. Cuyler*, 634 F.2d 109 (3d Cir.1980), *citing Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Supreme Court, in *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), named as legitimate goals of the corrections system: deterrence of crime; rehabilitation of criminals, and the central goal of maintaining security and order within the correctional facilities. The Court stated that considerations of rehabilitation and security "are peculiarly within the province and professional expertise of corrections officials," and that "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Two succeeding Supreme Court cases also speak of the "wide-ranging" deference to be accorded prison officials in the adoption and execution of policies that are in their judgment necessary to further legitimate institutional goals. *See Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Bell v. Wolfish, supra*.

The Third Circuit in the *St. Claire* case, *supra*, adding a further gloss to these Supreme Court opinions, has explicitly stated that these opinions "leave no room for a requirement that prison officials choose the least restrictive regulation consistent with prison discipline," as such a requirement is inconsistent with a deferential review. *Id.* at 114. Further, officials do not have the burden of affirmatively showing that a restriction would in fact be detrimental to proper penological objectives; all officials must do is show a *potential* danger to security, and may submit this evidence in the form of the opinions of responsible officials "held sincerely and arguably correct." [6] In order to overcome the presump-

Jumu'ah, just as if they actually worked inside.

6. The *St. Claire* court did not decide whether the showing of a *potential* threat to *non-security*

tion of validity accorded to prison regulations, the prisoner must prove that the officials' response to security considerations is exaggerated.

In rejecting, within the prison context, the "least restrictive alternative" approach to governmental infringements on First Amendment rights in favor of a deferential review, the *St. Claire* court implicitly stated, this court believes, that a prison regulation may be overbroad yet still be valid. That is, an institution-wide policy may cast too wide a net, and catch within it some individuals for whom the same goals could be achieved with less trampling upon their rights. So long as such a policy, drafted to cover all inmates, effectively serves a valid goal, it is permissible, although it may have a particularly negative impact on some inmates. The rejection of a "least restrictive alternative" approach means that regulations need not be drafted so as to give individual consideration to the peculiar circumstances of each particular class of inmates.

2. Standard 853 and the March 7 policy were explained as institution-wide means designed to advance the goals of both security and order, and rehabilitation. Based on the testimony of the defendants, the court concludes that the means selected plausibly advance these goals. Thus, the court believes it is virtually constrained to hold that, even as applied to plaintiffs, the two policies are valid.

Still, the Supreme Court cases do also speak of the need for a *"mutual* accommodation" between institutional objectives and constitutional rights. *See, e.g., Bell, supra,* 441 U.S. at 546, 99 S.Ct. at 1878, *cited in St. Claire, supra,* at 112. Therefore, some effort must be made to afford prisoners reasonable opportunities for the exercise of religious freedom. *See Barrett v. Commonwealth of Virginia,* 689 F.2d 498, 501 (4th Cir.1982). Although officials need not adopt the *least* restrictive approach consistent with its goals, neither would it

seem they may adopt the *most* restrictive approach when faced with a claim of constitutional right. In effect, the application of the two policies to the plaintiffs is the most restrictive alternative. Therefore, the court believes it is necessary to consider the validity of the defendants' objections to the individualized alternatives posed by plaintiffs. (These objections are included in the court's findings of fact, *supra.*)

■ We must conclude that proposals having the effect of potentially concentrating all Muslim inmates in one or two inside details could be properly rejected as potential dangers to prison order and security. *See Jones, supra* (comparable facts). In drawing this conclusion, as well as the ones which follow, we defer to the expertise of the defendants. Proposals having the effect of displacing more dangerous inmates from inside jobs could be properly rejected on the same grounds. Proposals for weekend work as a substitute for Friday labor could properly be rejected as potential dangers to security insofar as such proposals would necessitate the diversion of manpower from other programs requiring supervision. Proposals to allow inmates working on the 1100 acre grounds to return (escorted or unescorted) to their buildings for the Jumu'ah could properly be rejected on both security (particularly in the case of gang minimum inmates) and rehabilitation grounds. Finally, *all* proposals, insofar as they might be perceived by other inmates as evidence of favored treatment, could properly be rejected on the grounds of both security and rehabilitation. Thus, it appears that no less restrictive alternative could be adopted without potentially compromising a legitimate institutional objective. Therefore, the court cannot conclude that the defendants are in violation of plaintiffs' First Amendment rights.

■ 3. Plaintiffs' equal protection challenge must also fail. The "least restrictive alternative" approach applicable to equal protection cases involving fundamental

---

goals (e.g., rehabilitation) would be sufficient grounds for restricting First Amendment practices. This is an issue this court need not decide, since the defendants' justifications for the restrictions are at least substantially tied to security concerns.

rights, such as religious expression, must undergo the same modification it undergoes in the First Amendment context. Therefore, that Jews and Christians are able to attend their Sabbath services while Muslims may not is not in violation of the equal protection clause, as the practices of Christians and Jews in no way impinge upon the institution's objectives.

It is true that as a general matter, inmates of any religion may not be denied the reasonable opportunity to pursue their faith comparable to the opportunity afforded prisoners of other faiths. *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). But this does not mean that religious opportunities need be identical. *Id.* at 322 n. 2, 92 S.Ct. at 1081 n. 2. Here, the evidence indicates that generally Muslims have opportunities similar to those of everyone else. There is, for example, an inam who regularly visits Leesburg, conducts a service on Wednesday nights, and is paid by the state. Furthermore, Leesburg makes special arrangements to accommodate the dietary needs of Muslims during Ramadan, a month-long holy season, suggesting that Muslims are not ignored in the observance of important religious events.

4. Finally, the plaintiffs have not proved that the policies under discussion, facially valid, were adopted with the impermissible goal of restricting their religious rights.

5. In view of the foregoing, plaintiffs' claims for compensatory and punitive damages must also be dismissed.

The foregoing represents the court's findings of fact and conclusions of law.