**William F. HIGGINS, Appellant,**

v.

**J. BURROUGHS; Lieutenant Dietrich; Pasquale Baron; and Charles H. Zimmerman.**

No. 86–1162.

United States Court of Appeals,
Third Circuit.

April 10, 1987.

As Amended May 11, 1987.

---

**120**

Shanin Specter (argued), Beasley, Hewson, Casey, Colleran, Erbstein & Thistle, Philadelphia, Pa., for appellant.

LeRoy S. Zimmerman, Atty. Gen., Laura Fredericks (argued), Deputy Atty. Gen., Gregory R. Neuhauser, Sr. Deputy Atty. Gen., Andrew S. Gordon, Chief Deputy Atty. Gen., Chief, Litigation Section, Office of Atty. Gen., Philadelphia, Pa., for appellees.

Argued Oct. 27, 1986

Before GIBBONS, Chief Judge, and HIGGINBOTHAM and GARTH, Circuit Judges.

Reargued March 3, 1987

Before ADAMS, HIGGINBOTHAM, and GARTH, Circuit Judges.

### OPINION OF THE COURT

GARTH, Circuit Judge:

This appeal presents the question as to whether under the standard announced in *Shabazz v. O'Lone*,[1] a state prison's regulations which prohibit a prisoner from carrying his rosary beads into the prison visiting area may be sustained. The district court held the regulation valid. We reverse.

I.

William Higgins, a fifty-six year old prisoner serving a long-term sentence for homicide at the State Correctional Institute at Graterford (SCIG), is an observant Catholic who has been carrying rosary beads in his pockets at all times since his teen years, and who believes that he should carry them at all times, including during his term in prison. App. at 64–66. Higgins attended Catholic schools, and he often attends religious services at the prison. Higgins has been carrying rosary beads in his pockets since he first was incarcerated, in 1977. Neither the sincerity of Higgins' beliefs, nor his religious attachment to rosary beads, which are used by practicing Catholics to properly count and sequence prayers, is in dispute.

Higgins states that until June 3, 1985, he carried beads into all areas of the prison, including the visiting area, without difficulty. In October 1984, however, SCIG provided inmates with new trousers to be worn only in the visiting area. These trousers had no pockets into which Higgins could place his beads; he therefore resorted to carrying them in his hands. From October, 1984 until June 3, 1985, Higgins asserts, he carried the beads without incident into the visiting area, in his hands.

---

1. *Shabazz v. O'Lone*, 782 F.2d 416 (3d Cir.) (in banc) (Hunter, J. and Garth, J., dissenting), *cert. granted*, —— U.S. ——, 107 S.Ct. 21, 92 L.Ed.2d 772, —— U.S. ——, 107 S.Ct. 268, 93 L.Ed.2d 245 (1986).

This case originally was heard on October 27, 1986. Thereafter, Judge Adams, a member of the panel, resigned from the court. An order of rehearing was issued on February 2, 1987.

When he tried to carry his rosary beads into the visiting area on June 3, 1985, however, he was forbidden from doing so by the first-time enforcement of a standing rule which only permitted "wedding ring, glasses and approved medal[s]" to be brought into the visiting areas. App. at 171. Religious medals, the prison regulations state, are to be "worn", not carried; and they cannot exceed the size of a 50–cent piece. *Id.*

Deprived of the ability to keep the beads with him in the visiting area Higgins filed a pro se complaint, which protested the infringement of his first amendment rights. SCIG defended its practice by alleging that security considerations dictated the prohibition. SCIG supported this claim by submitting to the court the opinions of two officials from the prison. Based on the facts SCIG presented, the district court granted summary judgment in favor of SCIG and against Higgins.

The district court's opinion purportedly measured the evidence presented by SCIG against the newly minted standard for the accommodation of the religious rights of prisoners set forth in *Shabazz v. O'Lone,* 782 F.2d 416 (3d Cir.) (in banc), *cert. granted,* — U.S. —, 107 S.Ct. 21, 92 L.Ed.2d 772, — U.S. —, 107 S.Ct. 268, 93 L.Ed.2d 245 (1986). It concluded that the record supports SCIG's position that the regulations serve security goals and accommodate prisoners' religious rights. Contrary to the district court, we hold that the *Shabazz* standard was not met in this case.

## II.

In *Shabazz,* minimum security Muslim prisoners discovered that as a result of new prison security regulations designed to help deal with overcrowding at the prison, some prisoners were denied the right to return from work details at varying distances from the main prison to attend "Jumu'ah," a weekly communal religious service. The prison introduced credible evidence, through experts and experienced prison officials, which indicated that the practice of sending out details of guards to accompany prisoners back from work entailed (1) se-vere inefficiencies and logistical problems in the allocation of prison resources, with attendant security risks, when guards were detached from normal duties at a period when the prison was seriously overcrowded; and (2) serious rehabilitation goals which would be jeopardized by any of the various alternatives that might be mandated by efforts at "mutual accommodation." Evidence also indicated that many of the requests by prisoners to attend services were made by persons who were insincere in their religious beliefs and who wished only to avoid outside work details. 782 F.2d at 426–29.

The court in *Shabazz* remanded the proceeding for another hearing after promulgating a new standard designed to accommodate the religious rights of prisoners. It did so because under the earlier standard announced in *St. Claire v. Cuyler,* 634 F.2d 109 (3d Cir.1980), a mere declaration by prison officials "that certain religious practices raise potential security concerns [was] sufficient to override a prisoner's first amendment right ..." 782 F.2d at 419.

Creating a new, two-part test, the *Shabazz* court demanded that the State prove "[1] that the challenged regulations were intended to serve, and do serve, the important penological goal of security, and [2] that no reasonable method exists by which appellants' religious rights can be accommodated without creating bona fide security problems." 782 F.2d at 420. *Shabazz* criticized the older *St. Claire* standard for failing to place on the state a *"burden of showing that bona fide security problems occurred or are likely to arise because of the religious practice at issue." Id.* at 419 (emphasis added).

Thus, at least two major differences emerged between the older *St. Claire* standard and the recently adopted *Shabazz* standard. One difference emphasized the state's burden of demonstrating that a bona fide security problem existed or was likely to arise. The second difference emphasized that whatever deference must be given to decisions by prison officials in areas concerning prison security, when

first amendment values are implicated this deference must be tempered to accommodate free exercise values.

We turn now to the record which SCIG claims meets the tests set by this standard.

### III.

### A.

In full, the record pertaining to prison security concerns, consists of no more than a two-page affidavit and two pages of dialogue in a deposition of longer length. App. at 12–13, 206–08, 222. Major William Winder, a guard at SCIG, asserted:

Rosary beads do not fall within SCIG's visiting area regulations' definition of approved medal. Rosary beads could be used in the visiting area as a weapon or to hide contraband which would jeopardize the security at SCIG [Graterford].

App. at 13.

The other expression of concern about security was provided in response to questions that were asked of Officer Donald Vaughn, now the Deputy Superintendent for Operations at SCIG. Officer Vaughn touched on the two problems that Winder had alluded to: (1) weapons and (2) contraband. He stated that it was possible for him to envision circumstances in which the rosary beads at issue in this case could conceivably be used to hide contraband:

A: You would be surprised, and I don't want to get into war stories with you, but over my tenure I have found several things that most people take, normal everyday items that are used that could be turned around in prison and used for other things.

Q: ... [W]hat could be put inside these beads, what could be hidden. Do you understand what I am saying?

A: The beads themselves could be altered and it could be the form of a tablet or pill or anything.

Q: Could you put a weapon in them?

A: No, you couldn't put a weapon in them.

App. at 206–07.

Later, Vaughn expanded on his theory that drugs might be smuggled to prisoners inside the beads. Friends or relatives, he suggested, might smuggle drugs to a prisoner using the holes through which the beads are strung:

A: ... Most people would think that you couldn't hide contraband under a stamp, and we have found things hidden under a stamp. If I was to really take this and give it to my security officer he would come up with all different types of ways, because of the fact you would be surprised how some things, very small items are tried to be smuggled in by visitors, relatives and friends that make a person high. So I wouldn't put anything past anybody from trying to put something in the holes.

App. at 222.

Vaughn also provided a scenario to explain how the rosary beads could become weapons:

Q: Tell me how these beads could be used as a weapon, please.

A: You can take these and wrap them around someone's neck, *even though they broke before you could do anything*, even a female, and sometimes females are more fragile than a male. And we have had several incidents in the visiting room where inmates have attacked their female visitors, whether they are pregnant, mothers, sisters, girlfriends, whatever.

Q: [interrupted]

A: We are talking about various different types [of beads]. As I told you, these would probably break, but there are various different types of rosary beads.

App. at 208 (emphasis added).

The above excerpts from the record constitute the only evidence substantiating SCIG's fear that hand-carried rosary beads present a threat to security.

### B.

Our reading of the record does not establish that rosary beads are dangerous, or that they present a security risk. The record does not indicate that a string of

rosary beads held in a hand is any more dangerous than the prisoner's open hand, which at least arguably could be used to choke a victim or to "palm" a pill smuggled from the outside. Even more significantly, no suggestion has ever been made that rosary beads, which the evidence reveals have been and are consistently permitted to be carried in the general prison population, have ever been deemed to be dangerous or regarded as a weapon. If rosary beads are weapons, as SCIG now contends, then it is difficult to understand why "weapons" such as these are routinely permitted throughout the prison. Appellee's brief at 13.

Nor does the record explain how contraband can be compressed into the area between the string and beads made of solid wood. The most that can be gleaned from the record is that any legitimate concern which a prison may have with respect to hollowed-out rosary beads which might be considered as a possible receptacle for contraband could be readily accommodated— by the same type of inspection which takes place with respect to religious medallions which the regulations already permit in the visiting area. App. at 226.

Not only is there no proof in the record to affirmatively establish a legitimate security concern about rosary beads used either as a weapon or to hide contraband, but the evidence points to a contrary conclusion. Officer Vaughn himself conceded that rosary beads would break apart in any attempt to use them as a weapon. App. at 206–08. And he admitted that never, to his knowledge, had rosary beads or even necklaces been used to smuggle items into or out of the prison. His only qualification was as follows:

Q: Have you had security problems relating to people wearing religious metals [sic] around their neck?

A: We have had several attempts for inmates to try to bring back different types of chains that they hadn't worn into the visiting room. And vice versa, inmates trying to give the chains to their loved ones.

App. at 226. He admitted that neck chains to which religious medals are attached are at least as useful as weapons (for purposes of strangulation) as rosary beads (assuming that rosary beads were strong enough to hold together), but acknowledged that neck chains are not prohibited in the visiting area while beads are. App. at 117. He further stated that he could "see no problems with the beads as they lie before me, recognizing what they are, as a praying system, not to be worn, but to be carried." App. at 113.

### C.

Moreover, the record establishes that the regulations as they may be applied to the hand-carrying of rosary beads were never intended to serve security goals. Officer Vaughn testified on deposition that the regulations were promulgated to place strict, arbitrary limits on the material possessions that a prisoner could bring with him to the visiting area:

Q: . . . is there anything specific about carrying these in the pocket that constitutes a greater threat than what is currently allowed, which is, as I think you have told me, the necklace worn around the neck with a medallion [which is allowed]?

A: Only because we do not allow inmates to carry anything in the visiting room except a wedding band and a religious medallion.

Q: Why not?

A: That's the rule.

Q: Why?

A: Controlling purposes.

Q: Why?

A: If you give them a rosary, next week it will be a wallet, the next week it will be an ink pad.

App. at 119–20.

Officer Vaughn also testified that the decision to prohibit hand-carried beads grew out of his personal feeling, based on consultation with priests, that rosary beads were not essential ("needed") in a visiting room:

*If I felt that this is something that a person would need in the visiting room when he is visiting with his people, I*

*would say yes, I have no problem with it.* But at this time I view it as contraband in the visiting room due to the fact that it is not allowed, and I have information from priests who ... I consulted with, that this is something that is not needed.

App. at 145 (emphasis added).

In summary, based on this record, the risk of using hand-carried rosary beads either as a weapon or for purposes of concealing contraband has not been established. Thus, unlike the district court, we conclude that the threshold requirement of the *Shabazz* standard has not been met, because no bona fide security risk occurred or is likely to arise because of the religious practice at issue. *Shabazz,* 782 F.2d at 714.

### IV.

Because SCIG has not demonstrated a "bona fide security problem," we have no need to address the accommodation standard of *Shabazz,* which would require proof that SCIG has made reasonable efforts to accommodate both Higgins' religious practices and SCIG's security concerns. SCIG having failed to prove any bona fide security concern, no need exists to "accommodate" Higgins' religious practice of carrying rosary beads into the visiting area.

Thus, while we have grave reservations about the state's purported accommodation of Higgins' practice—particularly in light of Officer Vaughn's testimony that all that would be required would be to order the next "batch of pants" with a pocket—App. at 122–23,[2] we find no reason to prolong our discussion with an analysis of free exercise accommodation.

### V.

Because SCIG has not carried its requisite burden of demonstrating that a bona

fide security problem has occurred or is likely to arise because Higgins hand-carried his rosary beads into the visiting area, we will reverse the judgment of the district court and remand for further proceedings consistent with the foregoing opinion.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.

When we heard reargument in this case on March 3, 1987, certiorari had been granted in *Shabazz v. O'Lone,* 782 F.2d 416 (3d Cir.) (in banc) (Hunter, J., joined by Garth, J., dissenting), *cert. granted,* —— U.S. ——, 107 S.Ct. 268, 93 L.Ed.2d 245 (1986). Since then, *Shabazz* has been argued before the United States Supreme Court. *See* 55 U.S.L.W. 3616 (U.S. Mar. 24, 1987). I think that we should not decide this matter now, since—as the majority admits—"this appeal presents a question ... under the standard announced in *Shabazz.*" Maj. op. at 120. However, if we are to predicate an opinion on the *Shabazz* standard, I respectfully dissent from the conclusion that "the record does not establish that rosary beads ... present a security risk." Maj. op. at 122–23.

This appeal is from a grant of summary judgment. If the majority were merely remanding this matter for a full evidentiary hearing, I would not dissent. But the majority is making findings on what are, at a minimum, disputed and genuine issues of material fact. While there was probably an absence of disputed material facts sufficient to warrant the entry of summary judgment for the State, there is certainly—even reading the record in what the majority considers the light most favorable to Higgins—enough of a dispute to require some further evidentiary hearing on the contraband issue. Given even the majority's view of the facts, in other words, the matter should be remanded to the district

---

**2.** Officer Vaughn testified that the solution to the Higgins problem was obvious and not particularly taxing:

Q: If Mr. Higgins is allowed to carry his rosaries in his pants pocket in the visiting room, how will you respond to that so as to maintain maximum order, security and control?

A: I would probably have to order my next batch of pants with a pocket.

Q: Anything else?

A: There wouldn't be anything else necessary....

App. at 122–23.

court for further findings on a full evidentiary record.

## I.

The record in this case establishes that rosary beads typically consist of a string up to two feet long, with wooden beads of varying sizes and an attached wooden cross of approximately one to three inches in length. Included in the officials' reasons for refusing to allow Higgins to bring his rosary beads with him into the visiting room was the danger that, hollowed out, the beads could be used to smuggle contraband such as drugs from the visiting area back into the prison. App. at 206–207. Inspecting the beads upon entering and exiting the visiting room, the State maintains, would be both an impracticable and unreasonable burden to place upon its prison guards. Brief for Appellees at 3. The district court agreed that prison officials should not be required to accommodate Higgins' claimed free exercise interest in carrying his rosary beads *at all times*. "It would be impracticable, unreasonable and too time-consuming to have prison security dismantle and inspect upwards of fifty individual beads contained in the rosary each time the prisoner enters and exits the visiting room." *Higgins v. Burroughs*, No. 85–3655, mem. op. at 5 (E.D.Pa. Feb. 26, 1986) [Available on WESTLAW, DCTU database].

As Higgins points out, statements by prison officials indicate that accommodation of his claim is possible but, from their perspective, undesirable. For example, in his deposition Deputy Vaughn acknowledged that "[i]f I felt that [the rosary] is something that a person would need in the visiting room when he is visiting with his people, I would say yes, I have no problem with it." App. at 145. Higgins also stresses that Deputy Vaughn testified that he would merely order the next batch of prison pants with pockets if a court ordered that Higgins be allowed to carry his rosary into the visiting area. *Id.* at 123. From these two statements, Higgins concludes that permitting him to carry his beads into the visiting area "would require no greater measures for the order, security and control at Graterford than what already ex-

ists." Brief for Appellant at 6. Higgins contends that, because officials have conceded that accommodation is possible, the first amendment mandates that he be allowed to carry the rosary into the visiting area.

## II.

The minimum security plaintiffs in *Shabazz* were denied all access to the central religious service of their faith even though inmates who were classified as greater security risks were allowed to attend the weekly Jumu'ah service. In such a situation, we held, officials should be required to show that accommodation would pose a genuine security problem. *Shabazz* thus articulated a balancing test, which weighs the degree of infringement of a free exercise interest against the degree of risk posed by accommodation, and places the burden on prison officials to demonstrate that no reasonable accommodation exists. We remanded *Shabazz* so that the district court could determine through additional fact-finding whether the prisoners' free exercise interest reasonably could be accommodated by prison officials without creating an undue security risk. *Shabazz*, 782 F.2d at 420. We did not decide that accommodation was constitutionally *mandatory*. *Shabazz* held only that security considerations and the feasibility of accommodation must be weighed against the claimed infringement of free exercise rights. *Id.*

Prison officials already have accommodated Higgins's religious beliefs to a significant degree. He is permitted to carry his rosary beads throughout the prison, and only during the few hours he spends in the visiting area—some three or four times *per year*—is he forbidden to carry the beads. This amounts to less than ten out of approximately 8,760 hours per year.

The State's security concerns focus on the dangers of contraband storage. Deputy Vaughn testified that "the beads themselves could be altered and it could be the form of a tablet or pill or anything." App. at 207. He further testified that "we have found things hidden under stamps.... [Y]ou would be surprised how some things, very small items are tried to be smuggled in.... I wouldn't put anything past any-

body from trying to put something in the holes." *Id.* at 222. I am persuaded that, even if the district court improperly concluded that summary judgment for the State was warranted, whether this contraband risk outweighs Higgins's free exercise right should be reconsidered by the district court, assisted by further findings.

### III.

Because Higgins's religious beliefs already have been substantially accommodated, and because valid security considerations appear to militate against creating this cumbersome exception to the State's visiting area regulations, I decline to intrude into the province of the state penological system on the record before us at this time. For the foregoing reasons, I respectfully dissent.