**Ahmad Uthman SHABAZZ and
Sadr-Ud-Din Mateen**

v.

**Edward O'LONE, Individually and in his official capacity as Administrator of Leesburg Prison Complex and James A. Ucci, Individually and in his official capacity as Chief Deputy Keeper of Leesburg Prison Complex and William Fauver, Individually and in his official capacity as Commissioner of the New Jersey Department of Corrections.**

**Appeal of Ahmad Uthman SHABAZZ and Sadr-Ud-Din Mateen.**

No. 84–5772.

United States Court of Appeals,
Third Circuit.

Argued June 21, 1985.

Argued in Banc Nov. 12, 1985.

Decided Jan. 27, 1986.

James Katz (argued), Tomar, Parks, Seliger, Simonoff & Adourian, Haddonfield, N.J., for appellants.

Irwin I. Kimmelman, Atty. Gen. of New Jersey, James J. Ciancia, Asst. Atty. Gen. (Laurie M. Hodian (argued) Deputy Atty. Gen., of counsel), for appellees.

Before ADAMS, Acting Chief Judge, SEITZ, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER, BECKER, STAPLETON and MANSMANN, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Acting Chief Judge.

Appellants, two state prison inmates, brought this suit under the federal civil rights act challenging certain prison regulations as violative of their first amendment rights. Specifically, they allege that the regulations, which prevent them from attending weekly religious services, infringe their right freely to exercise their chosen faith. The district court, 595 F.Supp. 928 (1984), after a hearing, found no constitutional violation. It therefore denied appellants' request for injunctive relief and dismissed their claims for damages. The prisoners' appeal was originally heard before a panel of this Court, which decided it under the standard set forth in *St. Claire v. Cuyler*, 634 F.2d 109 (3d Cir.1980). That standard has governed inmates' challenges to prison regulations on religious grounds in this Court since *St. Claire* was decided. However, there has been an increasing concern that the *St. Claire* test provides inadequate protection for the rights of prisoners freely to exercise their religion. Because of this concern, rehearing in banc was granted for the purpose of reconsidering the *St. Claire* standard. We now conclude that *St. Claire* should be modified. The judgment for defendants will therefore be vacated and the matter remanded to the district court to be reconsidered in light of the standard articulated in this opinion.

I.

Ahmad Uthman Shabazz and Sadr-Ud-Din Mateen, the appellants here, are inmates at the New Jersey State Prison at Leesburg, and are members of the Islamic faith. Leesburg is a medium security prison and work institution, which houses prisoners and trains them to engage in various programs to produce goods and provide services for the state.

Prisoners at Leesburg are assigned to one of three custody classifications: maximum security, gang minimum, or full minimum. These classifications determine the jobs and work locations to which the prisoners are assigned. Maximum security prisoners are given tasks that are performed within the main building. Gang minimum inmates work at job sites outside the gates of the main building but must remain under the supervision of a corrections officer at all times. Prisoners within the full minimum classification also work outside the main building, but under minimal supervision, and are housed at a minimum security facility known as the Farm. Both Shabazz and Mateen were classified gang minimum when this suit was filed; in May 1984, Mateen was reclassified as a full minimum prisoner and transferred to the Farm.

At issue here is the right of minimum-security Muslim prisoners to attend Jumu'ah, the weekly religious service of the Muslim faith, when there is no evidence that their attendance in the past posed any threat to security. Jumu'ah is held at noon every Friday, as it must take place after the sun reaches its apex and before the Asr, or mid-afternoon prayer. It is the only Muslim congregational service of the week, is commanded by the Qur'an, and cannot be performed at any other time. Concededly, it is a central practice of the Muslim faith.

Jumu'ah services have been held at the prison since 1979. Prior to the implementation of the regulations challenged here, all prisoners of the Muslim faith were permitted to attend Jumu'ah if they wished. Those gang minimum prisoners who were ordinarily assigned to work details outside

the main building were assigned to alternative jobs within the main building on Fridays if they expressed a desire to attend Jumu'ah. Full minimum security inmates housed at the Farm were permitted to return by themselves to the main facility in order to attend the services.

In March 1984, however, two changes in correctional policy, one enacted at the state level and one by the officials at Leesburg, effectively eliminated the opportunity for most Muslim prisoners classified in the two lower security classes to attend Jumu'ah. In April 1983, the New Jersey Department of Corrections issued Standard 853, which required that gang minimum inmates ordinarily be assigned to jobs outside the main building. This resulted in the elimination of the alternative work details on Fridays for Muslim gang minimum prisoners. The prison officials explained Standard 853 as necessary to alleviate the critical overcrowding at Leesburg by reducing the number of inmates working in the main facility during the day.

A second change in prison policy was effected in March 1984, when Leesburg officials issued a memorandum announcing a flat ban on returns to the main facility by prisoners assigned to outside work details. This rule was said to be intended to reduce security and discipline problems by diminishing the burden on prison guards of accounting for and supervising inmates.

The combined effect of the two new regulations was that Muslim gang minimum prisoners could no longer remain inside the main building on Fridays in order to attend Jumu'ah, nor could they return from their outside work assignments to take part in the services. The ban on returns likewise barred most full minimum prisoners from attending Jumu'ah, although those full minimum inmates working near the Farm are permitted to return to that facility to attend a service there. Thus, since April 1983, only those prisoners considered the greatest security risks have been assured of participation in the Muslim services at Leesburg.

Shabazz and Mateen, both lesser security inmates, are precluded from attending Jumu'ah by the prison regulations. They filed this lawsuit against Leesburg prison officials under 42 U.S.C. § 1983 (1982), contending that the regulations infringe their right, guaranteed by the first amendment, freely to exercise their religion. It has been stipulated by all parties that the appellants' religious beliefs are sincere.

Appellants' claim was evaluated by the district court under the standard articulated in *St. Claire v. Cuyler*, 634 F.2d 109 (3d Cir.1980). Under the *St. Claire* test, the state must "produce evidence that to permit the exercise of first amendment rights would create a potential danger to institutional security." *Id.* at 114. Such evidence may consist of the expert testimony of prison officials who profess to believe that such a potential danger exists, if the officials' opinions are "held 'sincerely' and [are] arguably correct." *Id.* (quoting *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 127, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1976)). Once the state has satisfied its burden under the *St. Claire* analysis, the court must defer to the prison officials' judgment unless the inmate shows "by 'substantial evidence ... that the officials have exaggerated their response' to security considerations ... or that their beliefs are unreasonable." *Id.* at 115 (quoting *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)).

The district judge concluded that the state had met its burden under *St. Claire* by producing testimony from prison officials that the challenged regulations reduced the strain of overcrowding at Leesburg and eliminated security problems caused by prisoner returns during the workday. The officials' opinions were sincere, the court found, and arguably correct. Because appellants failed to show that the policy changes constituted an exaggerated response to security concerns, the district court entered judgment for the defendants. The prisoners filed this timely appeal.

## II.

Claims by inmates that prison regulations violate their constitutional rights raise difficult problems. Imprisonment necessarily places limits upon many of the constitutional freedoms enjoyed by free citizens. *See Jones,* 433 U.S. at 125, 97 S.Ct. at 2537; *Pell,* 417 U.S. at 822, 94 S.Ct. at 2804. It is also true that important state interests are at stake in the prison context, such as the maintenance of institutional security, and the preservation of internal order and discipline. *Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); *Pell,* 417 U.S. at 822–23, 94 S.Ct. at 2804. The Supreme Court has stressed repeatedly the importance of judicial recognition of the expertise of prison administrators, and the need for deference to experienced prison officials' judgment. *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878; *Jones,* 433 U.S. at 126, 97 S.Ct. at 2538; *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1973).

The Supreme Court has also emphasized, however, that inmates retain those constitutional rights that are not inconsistent with their status as prisoners or with the legitimate penological goals of the corrections system. *Jones,* 433 U.S. at 125, 97 S.Ct. at 2537; *Pell,* 417 U.S. at 822, 94 S.Ct. at 2804. While "a healthy sense of realism" may require that federal courts acknowledge their relative incompetence in the area of prison administration, *Procunier,* 416 U.S. at 405, 94 S.Ct. at 1807, it is also understood that "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Id.* at 405–06, 94 S.Ct. at 1807–08; *see also Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (per curiam); *Johnson v. Avery,* 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969). As stated by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974), there must be a "mutual accommodation" between the important institutional objective of security and the constitutionally protected rights of prisoners. *See also Bell,* 441 U.S. at 546, 99 S.Ct. at 1877.

However, the standard articulated in *St. Claire* does not call for such an accommodation. Rather, under *St. Claire,* a mere declaration by prison officials that certain religious practices raise potential security concerns is sufficient to override a prisoner's first amendment right to attend the central religious service of his faith. The prison officials are not required to produce convincing evidence that they are unable to satisfy their institutional goals in any way that does not infringe the inmates' free exercise rights. Nor do they carry a burden of showing that bona fide security problems occurred or are likely to arise because of the religious practice at issue.

The flaw in the *St. Claire* standard is well illustrated by the facts presented in this case. The prison officials here do not claim that attendance at Jumu'ah is an inherently dangerous practice. Indeed, they could not, as attendance was permitted for all Muslim prisoners until the March 1984 implementation of the new regulations and there is no suggestion that such attendance resulted in any harm. Rather, defendants merely assert that security problems caused by overcrowding and understaffing necessitated the policy changes that outlawed attendance at Jumu'ah for nearly all but the maximum security prisoners. Although appellants suggested alternative methods of allocating work assignments that would both satisfy defendants' security concerns and honor the prisoners' wish to participate in Jumu'ah services, the prison administrators rejected these suggested solutions. They assert that any such accommodations would raise new security problems.[1] Yet,

---

1. The prison officials claim that the assignment of Muslim minimum security prisoners to alternative work details on Fridays would lead to the formation of affinity groups, or work groups consisting entirely of Muslim prisoners. According to the state, affinity groups can raise problems in maintaining order and discipline. We do not decide here the weight to be given to

under *St. Claire,* the state was under no burden to establish that such security concerns were genuine and were based upon more than speculation.

We do not here resolve the validity of defendants' contention that accommodation of the prisoners' religious rights cannot be accomplished without damage to institutional security.[2] Nor do we reach the ultimate question whether the prison regulations challenged here impermissibly impinge upon the plaintiffs' religious rights. We conclude only that the *St. Claire* standard, which did not require any inquiry into the feasibility of accommodating prisoners' religious practices, provides inadequate protection for their free exercise rights and therefore must be modified. Accordingly, we hold that, upon remand, the state must show that the challenged regulations were intended to serve, and do serve, the important penological goal of security, and that no reasonable method exists by which appellants' religious rights can be accommodated without creating bona fide security problems.[3] The expert testimony of prison officials should be given due weight, but such testimony is not dispositive of the issue whether no reasonable adjustment is possible. Thus, in resolving a motion for summary judgment in a case challenging prison regulations as violative of the free exercise clause, the district court must take into account all materials tendered in opposition thereto that raise genuine issues of material fact. Where it is found that reasonable methods of accommodation can be adopted without sacrificing either the state's interest in security or the prisoners' interest in freely exercising their religious rights, the state's refusal to allow the observance of a central religious practice cannot be justified and violates the prisoners' first amendment rights.[4]

The dissent complains that the test articulated here fails to give adequate weight to the principle of deference stated by the Supreme Court in its cases addressing prisoners' constitutional rights. We disagree. Federal courts must afford deference to decisions by prison officials in areas concerning security, but where first amendment values are implicated such deference must be tempered by an effort to accommodate free exercise values.

Further, none of the Supreme Court cases cited by the dissent as requiring deference to the arguably correct opinions of prison officials involved a practice that lies at the core of an explicit constitutional guarantee, such as the right to attend religious services central to the prisoners' faith. Cases concerning rights of association or privacy provide uncertain guidance in resolving the clash of interests presented here. Thus, while we are not unaware of the role that the deference principle has played in the Supreme Court's opinions regarding prisoners' rights, and indeed subscribe to that principle, we seek only to ensure that it does not deprive prisoners' free exercise rights of all content.

evidence concerning affinity groups in this case. However, such evidence may be presented to the district court on remand, for consideration under the standard set forth in this opinion.

**2.** We do not understand defendants to be arguing that any of the other legitimate penological interests identified in *Pell*—the deterrence of crime, the rehabilitation of criminals, and the segregation of prisoners from the public— would be threatened by permitting plaintiffs to attend Jumu'ah services. *See Pell,* 417 U.S. at 822–23, 94 S.Ct. at 2804. Indeed, nothing in the record in any way suggests that precluding prisoners from attending Jumu'ah services furthers any of these goals. What is more, it is difficult to imagine how allowing prisoners to participate in religious services could inhibit deterrence, rehabilitation, or segregation. If any-

thing, it would seem that attendance at religious services might play a role in facilitating inmates' rehabilitation and their eventual successful return to society.

**3.** Factors such as the endemic crowding in a state's prisons, the cost of implementing various methods of accommodating prisoners' religious rights, understaffing, and inmates' demonstrated proclivity to unruly conduct may be considered in determining whether a potential method of accommodation is reasonable.

**4.** *Dreibelbis v. Marks,* 742 F.2d 792 (3d Cir. 1984), and *Cole v. Flick,* 758 F.2d 124 (3d Cir.), *cert. denied* — U.S. ——, 106 S.Ct. 253, 88 L.Ed.2d 260 (1985), must now be read in light of this modification of *St. Claire.*

## III.

We recognize that the record in this case reveals particularly strong interests both on the part of the prisoners and on the part of the prison administrators. The regulations challenged here prohibit inmates whose religious beliefs are conceded to be sincere from attending the only weekly service of their faith. Furthermore, there is no indication that participation in Jumu'ah services by lesser security prisoners, which was allowed until March 1984, caused security problems. However, the security problems identified by the state cannot be disregarded and are worthy of serious consideration. We are mindful of the difficulties inherent in the effort to effect an accommodation that is both sensitive to the sincere religious practices and beliefs of the prisoners and based upon an appreciation of the security problems faced by prison administrators. Nonetheless, such an effort is required under *Wolff v. McDonnell* and *Bell v. Wolfish*, and federal courts are not free to abdicate their responsibility to see that a proper accommodation is achieved.

The district court should be given the opportunity to appraise the factors in this case in the light of the test we have adopted here. Therefore, the judgment of the district court will be vacated and the matter remanded for reconsideration under the standard set forth in this opinion.

JAMES HUNTER, III, Circuit Judge, with whom GARTH, Circuit Judge, joins, dissenting:

I cannot accept the majority's treatment of the institutional considerations prompting Leesburg's policies. These policies do not reflect an arbitrary restriction on the Jumu'ah service itself, but are founded in the very real problems of arranging for the service in a prison environment. Moreover, I have strong reservations about the role of "mutual accommodation" in the new legal standard governing prisoners' first amendment free exercise claims. The standard announced today is neither necessitated by the facts of the case before us nor supported by Supreme Court precedent. I must dissent.

### I.

Before March 1984, all prisoners at Leesburg could attend Jumu'ah, a Muslim service held Fridays after the sun reaches its apex and before the midafternoon prayer. Gang minimum security prisoners ordinarily assigned to work details outside the main building who wished to attend Jumu'ah services would be assigned to an alternate work detail within the main building. Full minimum inmates assigned to the Farm were also free to return from the field unescorted for Jumu'ah services.[1]

---

1. Leesburg presently assigns inmates to one of three custody classifications which affect where the inmate works. Maximum security inmates are assigned to tasks within the main building. Gang minimum inmates are assigned to jobs outside the main building's gates on Leesburg's grounds but are constantly under the supervision of a corrections attendant. Full minimum security inmates, unlike maximum and gang minimum inmates, are housed outside the main building in the Farm, a minimum security building, and work outside the main building, often off Leesburg's grounds, with minimal supervision.

Leesburg State Prison is not a "holding tank" but a specialized correctional facility that teaches the incarcerated the skills required to function in free society. Leesburg accomplishes this goal by structuring the inmates' prison experiences through stages of increasing responsibility. The typical Leesburg inmate arrives as a maximum security prisoner, confined to the main building. The inmate may progress to gang minimum status, where he is able to work outside the main building's walls in groups of eight to ten under constant supervision of a corrections official. In the final stage, full minimum, the inmate is allowed to work outside Leesburg's grounds with little or no supervision. *See* App. at 52; Standard 853, "Eligibility Criteria For Reduced Security Custody Consideration," App. at 270–71.

This progression provides Leesburg's inmates with a structured series of goals, and posits release in free society as the ultimate goal. By removing the inmates at each successive stage further away from the confines of the main building and from direct supervision, this structure attempts to illustrate the benefits of responsibility and to ease the inmates' transition into society. Essentially, the program is a socialization technique for those with demonstrated antisocial proclivities. *See* App. at 54, 159–60.

In April 1983, the New Jersey Department of Corrections had promulgated Standard 853. This standard provided, *inter alia*, that all gang minimum work details should be assigned to jobs outside the main building. Its purpose was to alleviate the strain on prison facilities by reducing the demand for supervision during that part of the day when gang minimum inmates are working outside details. The standard also attempted to reduce the tension between inmates and staff and among the inmates themselves, tensions associated with overcrowded prison conditions. In March 1984, Leesburg implemented this standard by changing the alternative inside gang minimum work detail to a maximum security detail.

On March 7, 1984, Leesburg announced a flat ban on returns to the main facility and to the Farm by prisoners assigned to outside work details. The district court found, and the record reflects, that this was done to reduce the burden on the supervising guards of accounting for inmates in transit and to reduce search procedures, overcrowding, and the attendant security risks presented by the already large volume of traffic at the main building's gate. In combination with Standard 853, the ban on returns effectively ended the opportunity for most gang minimum and full minimum inmates to attend Jumu'ah on a regular basis.

## II.

### A.

Although the free exercise clause of the first amendment protects religious activity from governmental interference, this protection, like other constitutional guarantees, is adjusted when it conflicts with the legitimate goals and policies of correctional institutions. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). The fact of conviction and internment necessarily implies that in-

mates' rights and privileges are not coextensive with those of the free citizens. *See Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

In *Pell*, the Supreme Court identified four basic goals of the correctional system: the deterrence of crime; the rehabilitation of criminals; the protection of the public; and the maintenance of institutional security. 417 U.S. at 822–23, 94 S.Ct. at 2804. The *Pell* court identified this last goal as the central goal of incarceration, essential to successful attainment of all other corrective goals. *Id.* at 823, 94 S.Ct. at 2804. The Court also observed that policies involving rehabilitation and institutional security "are particularly within the province and professional expertise of corrections officials," *id.* at 827, 94 S.Ct. at 2806, and admonished courts to defer to prison officials' decisions in these areas unless the evidence indicates that officials had greatly exaggerated their response to prison conditions. *Id.*

Although the majority opinion recognizes and reiterates the deference principle, the standard announced today displays a lack of appreciation for the considerations supporting this principle. In part, deference is dictated by the very fact that our prisons are "places of involuntary confinement of persons who have demonstrated proclivity for antisocial criminal, and often violent, conduct." *Hudson v. Palmer*, 468 U.S. 517, ——, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). Deference also stems from the inherent nature of the judicial branch as separate from those branches that administer our prisons, and lacking in the expertise to run correctional facilities. *See Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). Running a prison is "at best an extraordinarily difficult undertaking," *Wolff v. McDonnell*, 418 U.S. 539, 566, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935 (1974), and the considered pace by which we decide cases exposes us to the temptation to simplify the institutional con-

text of prison policies. In *Hewitt v. Helms*, 459 U.S. 460, 474, 103 S.Ct. 864, 873, 74 L.Ed.2d 675 (1983), the Supreme Court explained the relationship between the deference principle and the circumstances under which prison administrators must operate:

> As we said in *Rhodes v. Chapman*, 452 U.S. 337, 349 n. 14, 101 S.Ct. 2392, , 69 L.Ed.2d 59] (1981), "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and long-standing relations between prisoners and guards, prisoners *inter se*, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officals in this context, like that of those making parole decisions, turns largely on "purely subjective evaluations and on predictions of future behavior," *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 464 [, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158] (1981); indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution.

### B.

After acknowledging that federal courts are limited in their ability to review prison administrators' decisions, the majority then asserts that the ultimate goal of judicial review in free exercise cases "must be a 'mutual accommodation' between the important institutional objective of security and the constitutionally protected rights of prisoners." Maj.Op., at 419. While I agree that federal courts must police the unlawful abridgment of constitutional rights, we, by necessity, must support a higher level of restrictions on constitutional guarantees in a prison setting. However, under the majority's mutual accommodation standard, federal courts are no longer guardians of fundamental constitutional rights but arbitrators in disputes between prison officials and inmates. To facilitate this dubious new calling, the majority asks federal judges to second guess the administrators' judgment by finding "a reasonable method" to accommodate inmates. Contrary to the applicable precedent, the majority today opens the door to judicial review of those "discretionary actions that traditionally have been the business of prison administrators rather than the federal courts." *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976).

The new standard's lineage is uncertain at best. The term "mutual accommodation" first appears in *Wolff v. McDonnell*, a case involving alleged violations of inmates' due process rights. *Wolff*, 418 U.S. at 556, 94 S.Ct. at 2974. Subsequent Supreme Court decisions caution against construing this language as a license to the federal courts to determine the exact balance of constitutional rights and institutional interests. Indeed, only three years later, the Court admonished against extracting the term from its context and reading into it a broader meaning than it had in *Wolff*:

> In seeking a 'mutual accommodation between the institutional needs and objectives [of prisons] and the provisions of the Constitution that are of general application,' *Wolff v. McDonnell*, 418 U.S. at 556 [94 S.Ct. at 2975], this Court has repeatedly recognized the need for major restrictions on a prisoner's rights. *See, e.g., id.*, at 561–62 [94 S.Ct. at 2977–78]; *Lanza v. New York*, 370 U.S. 139, 143 [82 S.Ct. 1218, 1220–21, 8 L.Ed.2d 384] (1962). *These restrictions have applied as well where First Amendment values were implicated. See, e.g., Pell v. Procunier, supra; Procunier v. Martinez*, 416 U.S. 396 [94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Meachum v. Fano*, 427 U.S.

215 [96 S.Ct. 2532, 49 L.Ed.2d 451] (1976).

*Jones,* 433 U.S. at 129–30, 97 S.Ct. at 2539–40 (emphasis added).

The Court's direction to resist the temptation to invest "mutual accommodation" with a meaning foreign to its application is underscored by the Court's 1979 decision in *Bell v. Wolfish.* In *Bell,* the "mutual accommodation" language appears in a paragraph that explains the policy considerations behind the deference principle. In context, the Court uses the term to convey the message that rights retained by an inmate must yield to "[t]he fact of confinement as well as to the legitimate goals and policies of the penal institution." 441 U.S. at 546, 99 S.Ct. at 1877. The *Bell* Court then proceeded to explain the policies supporting judicial deference to the decisions of prison administrators:

> [M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees. "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier, supra,* [417 U.S.], at 823 [94 S.Ct. at 2804]; *see Jones v. North Carolina Prisoner' Labor Union, supra* [433 U.S.] at 129 [97 S.Ct. at 2540]; *Pocunier v. Martinez,* 416 U.S. 396, 412, 94 S.Ct. 1800, 1810, 40 L.Ed.2d 224 (1974). Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held

that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security. *Jones v. North Carolina Prisoners' Labor Union, supra* [433 U.S.], at 129 [97 S.Ct. at 2540]; *Pell v. Procunier, supra* [417 U.S.], at 822, 826 [94 S.Ct. at 2804, 2806]; *Procunier v. Martinez, supra* [416 U.S.], at 412–414 [, 94 S.Ct. at 1810–1812].

Finally, as the Court of Appeals correctly acknowledged, the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies aid practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Jones v. North Carolina Prisoners' Labor Union, supra* [433 U.S.], at 128 [97 S.Ct. at 2539]; *Procunier v. Martinez, supra* [416 U.S.], at 404–405 [94 S.Ct. at 1807–1808]; *Cruz v. Beto, supra* [405 U.S.], at 321 [92 S.Ct. at 1081]; *see Meachum v. Fano,* 427 U.S., at 228–229 [, 96 S.Ct. at 2540–2541]. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier,* 417 U.S. at 827 [94 S.Ct. at 2806].[a] We further observe

---

**a.** What the Court said in *Procunier v. Martinez* bears repeating here:

> "Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the

point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of these reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism."

*Ibid.* [footnote by the *Bell* Court].

that, on occasion, prison administrators may be "experts" only by Act of Congress or of a state legislature. But judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial. *Procunier v. Martinez, supra* [416 U.S.], at 405 [94 S.Ct. at 1807]; *cf. Meachum v. Fano, supra* [427 U.S.] at 229 [96 S.Ct. at 2540]. 441 U.S. 546–48, 99 S.Ct. at 1878–79. This language in no way supports the proposition that courts must endeavor to discern the precise mix between prison objectives and religious activity.

Nor does the context in which the term appears in *Wolff* warrant the majority's new standard. The paragraph, in its entirety, reads:

> Of course, as we have indicated, the fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed. *Cf. CSC v. Letter Carriers,* 413 U.S. 548 [, 93 S.Ct. 2880, 37 L.Ed.2d 796] (1973); *Broadrick v. Oklahoma,* 413 U.S. 601 [, 93 S.Ct. 2908, 37 L.Ed.2d 830] (1973); *Parker v. Levy,* 417 U.S. 733 [, 94 S.Ct. 2547, 41 L.Ed.2d 439] (1974). Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply. *Cf. Morrissey v. Brewer,* 408 U.S. [471] at 488 [92 S.Ct. 2593 at 2603]. In sum, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.

418 U.S. at 556, 94 S.Ct. at 2975.

There is an important clue in the majority opinion, however, that reveals the authority on which the majority rests its in-

vestiture of the term "mutual accommodation" with a new meaning. The majority states that "there has been an increasing concern that the *St. Claire* test [*St. Claire v. Cuyler,* 634 F.2d 109 (3d Cir.1980) ] provides inadequate protection for the rights of prisoners freely to exercise their religion." Maj.Op., at 417. This concern is founded upon a perception, unsupported by reference to empirical data or legal authority, of *St. Claire*'s inadequacy. Proceeding from that unsubstantiated "concern," the majority then announces a new standard which not only shifts the burden of proof to the state but also replaces the Supreme Court's established doctrine of deference with what amounts to a "least restrictive alternative" analysis. This new standard opens the door to a floodgate of future litigation to determine what "reasonable" accommodation must be permitted to override security or other penological objectives.

In contrast to *St. Claire,* which implemented *Jones* and which only allocated to the state the burden of going forward with evidence that to permit the exercise of the prisoner's first amendment rights would create a potential danger to institutional security, the majority would now place the burden on the state to prove that no reasonable means exist by which the prisoner's religious rights can be accommodated without impairing security. Again, in contrast to *St. Claire,* which placed the burden on the prisoners to prove, by substantial evidence, that the prison officials had exaggerated their response to security problems, or that the officials' beliefs were unreasonable, the majority does no more than require that the prisoners be given the opportunity to show that a reasonable method of accommodating a "central religious practice" exists that does not endanger security. Maj.Op., at 420. Thus, the majority has now departed from the burdens of proof and standards of deference prescribed by Supreme Court authority, and has done so on no more substantial basis than an unsupported and undefined perception that the *St. Claire* standard provided inadequate protec-

tion for the rights of prisoners to exercise their religion.

I do not share this perception, and consequently I cannot agree that it is necessary to create a new test *ex nihilo* to address it, particularly since the test proposed requires us to ignore Supreme Court instruction and precedent. That precedent provides the proper framework for analysis in the context of the present case.

### C.

The mutual accommodation doctrine is unfaithful to precedent in another way. Of the four penological goals identified by the *Pell* Court, the majority opinion asserts that only one, prison security, can be considered by the district courts dowsing for the ultimate goal. The court's failure to mention the other interests involved is particularly curious in the instant case. The record clearly shows that Leesburg adopted the policy changes to serve both rehabilitative and security goals, and the district court relied on both goals in dismissing the action.[2]

District courts will be forced to speculate as to whether the majority believes that administrators may limit free exercise rights only when security interests are at stake, or whether it tacitly found the rehabilitative justifications proffered below untenable. Although it is true that the maintenance of institutional security and order is the crux of the other goals, I know of no authority that restricts our review to security concerns.

### III.

The majority opinion minimizes the problems Leesburg confronts in allowing inmates to return from outside work for Jumu'ah by asserting that prison officials cannot claim that Jumu'ah raises an unacceptable risk to prison security. Maj.Op., at 419. It is true that Leesburg has not yet experienced problems with the service itself. The real problem, however, comes not from the service but from the allocation of resources required to hold the service and to regulate the passage of people for that purpose. Moreover, the logistical problems with Jumu'ah compromise the state's efforts to ease the inmates' transition from prison to free society. Leesburg adopted its "no return" policy in response to its experiences with inmates who systematically avoided outside work details with a battery of fictitious excuses. *See* App. at 158–59. For example, only about half of those who requested to remain in the main building for Jumu'ah actually attended the service. *See* App. at 72, 181. Finally, Leesburg's deferential treatment of Muslims and the institutionalized identification and separation of Muslims *vis-a-vis* other inmates and staff raise serious rehabilitative and security concerns glossed over by the majority. In short, the institutional context in no way provides a particularly compelling case calling for federal court entanglement in prison operations.

### A.

The record shows that State issued Standard 853, "Eligibility Criteria For Reduced Custody Consideration," to relieve prison tensions stemming from overcrowding and to provide a structured rehabilitative program.

Overcrowding is endemic in the New Jersey prison system. In 1981, Governor

---

2. I have difficulty comprehending the majority's professed inability to understand Leesburg officials "to be arguing that any of the other legitimate penological interests," *i.e.,* rehabilitation, are adversely affected by permitting returns. Maj.Op., at 420 n. 2. Subdivision "C" under the first argument in the State's brief to this court states, in pertinent part, that "[b]oth security and rehabilitative objectives" are impaired by returns. *See also id.* at 427–29. In any event, the majority's assumption that religious services, whenever they may be held, necessarily facilitate rehabilitation rests upon no firmer ground than its perception of *St. Claire's* inadequacy. The record before us contains testimony by Leesburg's officials that returns promote confrontational and nonassimilative behavior among the inmates. *See* App. at 88, 161, 183–85; *see also* App. at 299 (district court's findings of fact). The testimony was not contradicted by appellants. The deference principle, as well as the customarily accepted principles of civil procedure, dictate that we accept this evidence as true.

Byrne issued an executive order declaring a state of emergency in New Jersey's state and local correctional facilities. This order empowers New Jersey's Commissioner of the Department of Corrections to transfer inmates from local to state prisons. *See* App. at 282–291. The effect of this state of emergency has been to strain Leesburg's facilities to the limit. The Farm, originally designed to house 175 full minimum inmates, now houses about 500. The main building, constructed to accommodate 500 inmates, must now support 700. *See* App. at 157–58. Leesburg's Administrator Edward O'Lone's testimony highlights the wide range of security problems presented by the overcrowding:

> THE COURT: And when was that [the institution of gang minimum outside work details], about April of '83?
>
> THE WITNESS: Yes, your honor, when the standards changed. That was done greatly because Leesburg was designed for 504 inmates and housed as many, as I think it was quoted, 754 at one time. It has been my intention and continues to be my intention to keep as many inmates out of that compound during the day as possible. It alleviates all kinds of social pressures. Obviously, if I have a hundred inmates or 150 inmates out in the woods, that takes the pressure off the gymnasium, it takes the pressure off of the mess hall, it takes the pressure off the medical service, it takes the pressure off— and also takes the pressure off of each other and makes them more, in a very overcrowded situation, makes it a more socially adaptable environment.

App. at 157.

Prior to Standard 853, Leesburg's prisoners advanced directly from maximum security status to full minimum security status. Those so promoted would be relocated from the main building to the Farm. Gross overcrowding at the Farm and problems associated with inmates' advancement from a constantly to a rarely supervised status, however, resulted in the creation of the "gang minimum" security classification as an intermediate stage. Although gang minimum inmates must be housed in the main building, Leesburg's rehabilitative program requires them to work on the institution's grounds to participate in the sequence of increased responsibility. Leesburg's Chief Deputy James Ucci explained the problem cogently:

> THE WITNESS: The standards have changed somewhat, where originally an inmate would go—the majority of inmates would go from maximum or medium to full minimum. Then the standards come out and said that inmates had to spend a certain period of time in gang minimum.
>
> THE COURT: How long?
>
> THE WITNESS: We at Leesburg go from minimum of 30 days. It could be up to 90 days depending on, you know, the inmate and the case. But let's say 30 days, our minimum. And when this happened. Everybody that was full minimum, of course, went to the Farm. Now, we have all these men that would have normally been full minimum immediately and go to our Farm, right, or to Ancora. Mainly to the Farm, though. Now, all of a sudden you got all these guys that are gang minimum, right? So, now you got to do something with them so they are gang minimum.
>
> THE COURT: Because they're now entitled to outside work details.
>
> THE WITNESS: By definition they're supposed to work outside to show a certain amount of trust that they can handle as trust.
>
> THE COURT: Not just entitled but supposed to be.
>
> THE WITNESS: Supposed to be, right. Not entitled. If I used the word "entitled," I mean supposed to. We're compelled to put them in a reduced working or living atmosphere, either one of the two.

App. at 54–55.

### B.

Returning gang minimum inmates pose at least three distinct security risks to

Leesburg, all of which relate to the problem of arranging for Jumu'ah in a productive, overcrowded and understaffed prison facility. The first logistical problem concerns the distance of the outside work details from the main building. Many of the details work as far away as 45 minutes from the main building. *See* App. at 67, 82. Because gang minimum inmates must be constantly under the supervision of a corrections official, the return of one inmate requires the return of the entire detail to the main building's receiving gate, and consequently disrupts the work of the entire detail. *See* App. at 82–83. Second, the process of physically moving the inmate through the receiving gate poses a serious security risk. Because Leesburg is a productive facility, the truck traffic through the receiving gate during the day is heavy. Both trucks and inmates must enter Leesburg through the same gate, a situation that disrupts truck traffic and increases the possibility of escapes through the gate. Moreover, the timing of the return raises security problems because the services take place at about the same time as the noon meal. During this meal, most of the corrections officials are stationed as a security precaution around or in the dining hall. The increased risk of escapes during this mass movement of inmates requires Leesburg to keep its receiving gate shut. Consequently, those returning for Jumu'ah would be required to return well before the noon meal.[3]

3. Chief Deputy Ucci's testimony best illuminates these problems:

> Q. Is the receiving gate area where the trucks go in and out? Is that the area that requires intensive supervision?
> A. Well, yes, it is. It has been used in the past as an escape route by inmates. Just as recently as the other day at Trenton State Prison inmates hid in the food truck, three of them, and tried to escape. And I've been involved in my career in at least three escapes I know through receiving gates at Rahway State Prison. So it is an area of concern with myself and the administrator and the staff at the institution. It's one you got to be very alert at.
> Q. And the process for bringing inmates in, whether it's at the end of the workday or he would have to come in during the day, is that he comes to the receiving gate and what happens?
> A. He comes to the receiving gate, the officer, of course, would check. The officer brings them there, tells the officer that he's coming in at the receiving gate, and he'll authorize the tower officer to push the button to open the gate and he would walk through the gate, check him against his mug shot. Then, of course, they will, after they I.D. him, he will be stripped searched, center will be notified that he's coming in, and they will be brought into the institution.
> Q. And while the officers are handling that process, what happens to the truck traffic?
> A. The truck traffic has to be—of course has to be stopped while this is going on, you can't handle both traffics at the same time.
>
> . . . . . . .
>
> Q. Are there any other activities going on in the institution at that time [when inmates would return for Jumu'ah]?

> A. Yes, there is, mess is going on at that time; that's one of our major—at 12 noon mess is going on.
> Q. And what does mess involve?
> A. Noon meal.
> Q. How many inmates are fed at that time?
> A. It would affect the entire population, which would be over seven hundred inmates at that time.
> Q. Except for—
> A. Except the ones outside, of course.
> Q. Is that considered a mass movement of inmates?
> A. Yes. Mess is—noon meal is considered a mass movement in an institution.
> Q. Where is your staff at that time?
> A. At the time of mess you try to deploy most of your correction officers in your mess hall. Whenever you have a mass movement in the institution or a mass gathering you try to have as much staff available in that area at that given time. So, majority of your officers are in mess, are very available if they're needed in case there is a problem.
> Q. Is the receiving gate open at that time?
> A. No, the receiving gate is closed. The officers at the receiving gate are eating approximately at that time themselves and then they help out with other things.
> Q. You said that just before the noon mess there is an inmate count?
> A. There is a count at 11:30, yes.
> Q. And what does that entail?
> A. Well, that is a security count, so everyone in the institution has to be—every inmate at Leesburg State Prison, including Ancora, is accounted for and that means that the center keeper takes the count and every inmate that is not needed on an essential detail inside the institution or outside is locked in his cell or goes back to his dormatory unit and he's counted by the officer in that unit. Anyone

With regard to full minimum inmates returning from outside work, Leesburg experiences some of the same logistical problems at the Farm. The time lost in transit, however, is greater because full minimum inmates often work off Leesburg's grounds. *See* App. at 119–21.

These problems shed light on the associated concerns that permitting returns would cause for Leesburg's correctional goals. Returns effectively waste the whole productive day, not just for the practicing Muslim, but for the entire work detail that must accompany the practitioner back to the gate. Some of the rehabilitative benefits of the structuring process[4] would be lost, and allowing even one inmate an excuse to avoid work affects the supervisor-inmate relationship for the rest. *See* App. at 83, 161, 178.

Permitting returns by full minimum inmates is impractical for an additional reason. Many full minimum inmates participate in a work release program under the supervision of civilian employers. Administrator O'Lone noted that those employers might elect not to participate in the program if inmates were allowed to work four day weeks. Thus, permitting returns from civilian employment would bar Muslim inmates from work experience most closely approximating life in free society. *See* App. at 183.

## C.

The majority, however, is neither concerned with concrete logistical problems nor wasted efforts at rehabilitation, the institutional context of the two challenged policies. Instead, asserting that "there is no suggestion that [Jumu'ah] attendance [has] resulted in any harm," Maj.Op., at 419, the majority instructs the district court to devise an alternative work detail for Muslims. In a cryptic footnote, the majority indicates that the only conceivable defense Leesburg could raise would be evidence that alternative details would result in "affinity groups" deleterious to institutional security. *Id.* n. 1. These casual comments display a "concern" with abstraction as well as the avoidance of the hard practicality of the problem.[5]

---

that has an inmate in another area will submit a count slip to the center keeper and then the center keeper will, of course, correlate the slips and will make sure that every inmate is accounted for.

Q. And that takes approximately how long each day?

A. It could take anywheres from 15 to 25 minutes.

Q. And that begins at 11:30?

A. Approximately, now, 11:30. It could be a couple minutes after 11:30.

Q. Can inmates come in during the count process, come in from the outside?

A. During the security count there is, if possible, no movement at all. No, the gate wouldn't be open.

. . . . .

Q. Can inmates come in while the noon mess movement is occurring?

A. Under normal circumstances, no. But, of course, if we had to bring somebody in because of an emergency, yes. But under normal circumstances we don't like to open a receiving gate during mass movements.

Q. Why is that?

A. Well, the greater chance of escape again.

. . . . .

Q. And what was the basis for you issuing that [no return] policy or that memo?

THE COURT: Now here's the meat and potatoes question. You answer that one. I was going to ask that one myself. Why the change?

THE WITNESS: The change was made because of the fact that there was just too much traffic going through that gate, it was disrupting too many other—too many other movements through the receiving gate. It was just—we just couldn't handle all that traffic. It either meant backing trucks up four, five and six or it meant, you know, holding up the inmates.

THE COURT: You mean four, give and six trucks back up?

THE WITNESS: Yes, Sir. I been out there when it was pretty jammed up and it either would mean you can't do both, it means—it either means you hold up all your vehicle traffic or you hold up all your foot traffic. And it was just too much for that traffic gate. And we don't have officers to man the other [personnel] gate.

App. at 62–63, 79, 84, 86–87.

4. *See supra* note 1.

5. The majority allows, in general terms, that a state may meet its burden by producing evidence of factors such as overcrowding, understaffing, additional costs of accommodation, and inmate proclivity to violence. Maj. Op., at

A quick review of the record reveals concrete reasons for judicial deference. Leesburg implemented the gang minimum status less than a year before the no return policy, rendering evidence of problems with gang minimum attendance problematic. It is true that Leesburg initially attempted to accommodate gang minimum inmates who wished to attend Jumu'ah by creating an alternate work detail. This attempt at "mutual accommodation" collapsed in light of a number of problems. On the rehabilitative front, Leesburg found that a number of inmates would use any excuse to avoid outside work details. As Leesburg gradually removed the inmates' opportunity to use these fictitious excuses, by, for example, scheduling sick call well before the details were scheduled to leave for outside work, the inmates would move to the next excuse, trying to find the point of least resistance. As it stood, nearly half of those who asked to return for Jumu'ah received reprimands for failing to attend. Thus, on the facts of this case, creating a special exception for Jumu'ah presents the nearly impossible task of separating the conscientious from the nonconscientious.

On the security front, this separation process itself is inherently confrontational and exacerbates the tensions between staff and inmates. Further, the creation of an inside detail for gang minimums requires an extra expenditure of scarce resources to maintain the separation of maximum and gang minimum security prisoners in the main building and to handle the increased strain on prison facilities caused by the alternative detail. An alternative detail also would create the perception among inmates of special treatment for Muslims, which could foster divisive tensions between Muslim and non-Muslim inmates. This problem would be enhanced by the continued identification and association of Muslim inmates, the basis for the formation of prison gangs, euphemistically referred to as affinity groups.[6] *See generally* App. at 178–81.

## IV.

Under the standard adopted by this Circuit in *St. Claire v. Cuyler*, 634 F.2d 109 (3d Cir.1980), the foregoing reasons would be more than enough to justify Leesburg's policies. *See supra* p. 420. Yet, because the *St. Claire* standard fails to place a burden on the state "to establish that such security concerns were genuine and were based upon more than mere speculation," Maj.Op., at 420, the majority remands the case for another hearing.

---

420, n. 3. These factors are present here, adequately developed in the record, and identified in the district court's opinion, and uncontradicted by the prisoners. Thus, even applying the new standard, which I believe to be an incorrect standard, the majority should simply affirm the district court's judgment. Yet the majority refrains from applying its standard to the facts before it, merely instructing the district court to give Leesburg's officials' testimony "due weight." Maj.Op., at 420. By failing to affirm, the majority has sent a confusing signal to the district court, since the very factors which the majority now requires district courts to consider are apparently regarded by the majority of this court to be insufficient for purposes of an analysis under the majority's new standard.

6. Administrator O'Lone explained:

THE WITNESS: We have found out and think almost every prison administrator knows that any time you put a group of individuals together with one particular affinity interest that what you wind up with is a leadership role and an organizational structure that will almost invariably challenge the institutional authority. If you have a group that recognizes a specific leader, whether it be religious, social, psychological, whatever, once the leader is offended, the leader says, "we're not working." Or we're not doing something." And then you've got a confrontation.

THE COURT: This has been a concrete institutional experience, has it?

THE WITNESS: Yes, it has, your honor, not only in my institution, it's been a concrete institutional experience everywhere. That's one of the reasons that in prisons inmates are not permitted to wear insignia; that the bikers can't not wear their insignia and nobody wears colors because we can't have a thing where they can identify each other. "Don't punch him, he's safe." It's one of the reasons that we keep affinity groups dispersed. We recognize their right to meet and to have affinity groups under controlled situations, but sometimes that can get out of control. App. at 179–80.

The burden *St. Claire* places upon prison administrators is to testify to opinions that are " 'held "sincerely" and [are] arguably correct.' " 634 F.2d at 114 (citation omitted). This is the only burden permitted by the deference principle, a burden firmly rooted in precedent. This standard represents the reasoned extension of the Supreme Court's analysis in *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). In *Jones*, prisoners filed suit alleging that their first amendment free speech and associational rights were unlawfully abridged by a policy that restricted the prisoners' efforts at soliciting membership in a prison union and barred union meetings. The three-judge district court enjoined the regulations, concluding that "[t]here is not one scintilla of evidence to suggest that the Union has been utilized to disrupt the operation of the penal institutions." 433 U.S. at 124, 97 S.Ct. at 2537.

The Supreme Court reversed, holding that it was error for the court to place the burden on prison administrators "to show affirmatively that the Union would be 'detrimental to proper penological objectives' or would constitute a 'present danger to security and order.' " *Id.* at 128, 97 S.Ct. at 2539. Indeed, the administrators had to show only that their regulation was reasonable. *Id.* at 129, 97 S.Ct. at 2539. The *Jones* Court then placed the burden upon the prisoners to show that the administrators were "conclusively wrong in [the] view" that Union activity would harm the prisons' internal security and order. *Id.* at 132, 97 S.Ct. at 2541.

The majority maintains that *Jones* and other Supreme Court cases involving inmates' rights are inapplicable to cases involving the first amendment's free exercise guarantee. Maj.Op., at 420. I disagree. The Court has shown no inclination to draw arbitrary distinctions among constitutional guarantees for the purposes of analyzing inmates' rights, nor has the majority provided a tenable basis for us to do so today. Instead, the Supreme Court has used essentially the same analytic framework whether the claimed right has been based upon the first amendment's free speech and association guarantees, the fourth amendment's guarantee of privacy, or the fifth and fourteenth amendments' due process guarantees. *See, e.g., Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (fourteenth amendment's due process clause); *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (first amendment free speech rights, fourth amendment privacy rights, fifth amendment's due process clause); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (first amendment free speech and associational rights); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (first amendment free speech rights). These cases are still good law and clearly control this appeal. However, because the Supreme Court has yet to address specifically the scope of review over prison regulations limiting religious activity, the majority believes it is free to adopt a standard that is inconsistent with the precedent controlling analogous cases. I cannot disagree more strongly; free exercise does not require its own, nondeferential standard of review.

### V.

The new and nondeferential standard now imposed by the majority upon prison officials will not only cause substantial problems in the already difficult field of prison administration, but it will necessarily result in an impairment of security in those institutions where security is the primary consideration. Because I cannot subscribe to such a result, I would affirm the district court's dismissal of the suit, and I therefore dissent.